JOHN HENRY WEST, III *v.* STATE OF MARYLAND

[No. 1555, September Term, 1981.]

*Decided November 3, 1982.*

The cause was argued before MOYLAN and MOORE, JJ., and MORRIS W. TURK, Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Paul J. Reinstein* for appellant.

*Philip M. Andrews, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A.*

*Marshall, Jr., State's Attorney for Prince George's County,* and *William Hale, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

We are here called upon to explore a secluded but exotic corner of the double jeopardy garden — prosecutorial and judicial overreaching. In life, it is seldom seen except as an imagined possibility in the most painstakingly thorough of footnotes. As a contention, however, it is in luxuriant vogue and is being resorted to promiscuously. The antidote for the spell of the lotus blossoms is the sobering question, "Is the overreaching conduct that will bar a retrial, following a mistrial which circumstances have forced a defendant to request, limited to the deliberate derailment of a trial in progress or does it also embrace such other misconduct as the insinuating of error into the trial either (1) through gross negligence or (2) consciously, but with a design to win the trial rather than to abort it?" In a holding anticipated by this Court [1] and, in significant measure, by the Court of Appeals,[2] the Supreme Court in *Oregon v. Kennedy,*     U.S.    , 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), has now unequivocally resolved that it is only the deliberate derailing that will engage the gears of the double jeopardy machinery.

The appellant, John Henry West, III, was convicted by a Prince George's County jury, presided over by Judge Howard S. Chasanow, of first-degree rape. His most serious contention is:

1. That his retrial, following an earlier mistrial, unconstitutionally placed him twice in jeopardy.

---

1. Judge Lowe accurately called the shot in Bell v. State, 41 Md.App. 89, 395 A.2d 1200. We picked up on his prediction in Tabbs v. State, 43 Md.App. 20, 403 A.2d 796; Jones v. State, 44 Md.App. 417, 409 A.2d 725; Lee v. State, 47 Md.App. 367, 423 A.2d 267.

2. Bell v. State, 286 Md. 193, 406 A.2d 909, and Jones v. State, 288 Md. 618, 420 A.2d 1241.

The central evidence of guilt is not disputed. The fourteen-year-old rape victim soundly established the corpus delicti of the crime and the criminal agency of the appellant. It is from the peripheral proof that the legal issues have arisen. Involved is the replica of a .45 caliber automatic pistol which the police recovered from the appellant's apartment and which the rape victim identified as resembling the gun that intimidated her into submission. Involved also is the relationship among (1) the appellant; (2) the appellant's apartment mate, Mario Torney, on whom the defense blamed the crime; and (3) Mario's brother, Pierre Torney, the true owner of the .45 caliber replica. An inadmissible hearsay declaration from the lips of Mario Torney triggered the double jeopardy problem. Before we can even consider double jeopardy, however, we must first establish single jeopardy. In this regard, the appellant made one false start.

### The Blind Alley of
### Independent State Grounds

Faced unexpectedly at oral argument with the grim presence of *Oregon v. Kennedy* (then but two weeks old) and its almost certainly foreclosing effect, appellant's counsel instinctively dodged by asking this Court to base its double jeopardy holding on independent state grounds, turning to the Maryland Declaration of Rights if the Fifth Amendment should fail to serve. As attractive as the state's rights gambit might be on other occasions, it is, in the unusual context of double jeopardy law, doomed from the start.

Maryland, we need to remind ourselves periodically, has no constitutional bar against placing a defendant twice in jeopardy. As Chief Judge Brune pointed out in *Bennett v. State,* 229 Md. 208, 212, 182 A.2d 815, the defense of former jeopardy "is not provided for by any provision of the Maryland Constitution" and is only "available in this State as a matter of common law." Maryland is one of five states that never constitutionalized the law against double jeop-

ardy. J. Sigler, *Double Jeopardy* (1969).[3] All five of those states, to be sure, do extend to criminal defendants the protection against double jeopardy, but as that protection has evolved at the common law. At common law, initial jeopardy did not attach until a verdict was rendered. This is still the law in England; to the extent to which Maryland is free to apply its own law rather than the federal law imposed upon it by *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), it is the law here as well. *Hoffman v. State,* 20 Md. 425, 433-434; *State v. Shields,* 49 Md. 301, 303-304; *Gilpin v. State,* 142 Md. 464, 121 A. 354.

Under the common law approach, the very subject of retrials following mistrials is not an aspect of double jeopardy law at all. According to the traditional view, a defendant whose trial ends in a mistrial before the rendering of a verdict, has never been in jeopardy. There cannot be a second until there has been a first. In *Cornish v. State,* 272 Md. 312, 322 A.2d 880, Judge Eldridge spoke to this very proposition, at 272 Md. 316 n. 2:

> "The view in this state was that, under the common law's double jeopardy prohibition, jeopardy did not attach until the rendition of a verdict and that, therefore, a retrial following the declaration of a mistrial did not give rise to a double jeopardy problem."

*See also Kyle v. State,* 6 Md.App. 159, 250 A.2d 314; *Boone v. State,* 3 Md.App. 11, 23-25, 237 A.2d 787. On this subject, independent state grounds is a road leading nowhere.

### The Mistrial/Retrial Problem under Federal Constitutional Law

Under the federal version of double jeopardy law, by way of contrast, jeopardy is deemed to attach at the beginning of the trial rather than at its end. The necessity that pushed

---

**3.** The other four are Massachusetts, Connecticut, Vermont and North Carolina.

the attachment of jeopardy backward in time to this earlier stage was the determination by the Supreme Court to cram the mistrial/retrial problem within the coverage of double jeopardy law. As Justice Powell pointed out in his scholarly dissent in *Crist v. Bretz,* 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978), that expansion of double jeopardy law occurred late in the evolution of that law and occurred largely subconsciously, as an historic accident.

As a result of those expanded contours, however, the broad umbrella known as double jeopardy (in its federal manifestation) today embraces four distinct subspecies: (1) classic former jeopardy, arising out of the common law pleas in bar of *autrefois convict* and *autrefois acquit;* (2) simultaneous jeopardy, involving largely issues of merger and multiple punishment; (3) the problem of the retrial following mistrial; and (4) collateral estoppel. For three of those four subspecies, the common law's determination that jeopardy attached as the verdict was rendered did not need to be disturbed. A plea in bar of former acquittal or former conviction cannot be raised until there had been a verdict of acquittal or conviction; the very problems of multiple punishment and merger do not arise until there are multiple verdicts of conviction upon greater inclusive and lesser included offenses; collateral estoppel is predicated upon a jury finding of a particular fact. A declaration of mistrial, on the other hand, occurs before the jury has rendered its verdict. Once *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), uncritically treated mistrial/retrial law as an aspect of double jeopardy, it became logically compelling to move the attachment of jeopardy back to the earlier stage. It is now the federal law that in a jury trial, the magic moment when jeopardy begins is the instant that the jury is sworn. *Crist v. Bretz, supra,* at 437 U.S. 37-38.

As a consequence of that earlier attachment, the appellant here was in jeopardy when he first came to trial on the present charges before Judge Chasanow and a jury on July 10, 1981. It was in the course of the testimony of the second State's witness that the mistrial, requested by the appellant,

was declared. Corporal M. L. Sutter was on the stand. The State had in opening statement informed the jury that a possible State's witness, Mario Torney, was unavailable to appear. In the course of his direct examination, Corporal Sutter let slip the fact that the missing Mario Torney had, under police questioning, implicated the appellant in the rape. The pertinent part of that examination ran:

"Q. What did you do with Mr. Torney when you arrested Mr. West?

A. Mr. Torney was also brought back to the Criminal Investigation Division for a statement.

Q. Did you, in fact, have an interview with Mr. Torney, Mr. Mario Torney?

A. No, sir, I did not.

Q. Did another member of the police department have an interview with him?

A. Yes, sir.

Q. After taking this initial statement from Mr. West, what did you do?

A. I then left the room for a few minutes to find out that *Mr. Torney had implicated Mr. West in the rape.*" (Emphasis supplied).

It was as if the very courtroom had struck an iceberg. Cries of "abandon ship!" filled the air. The appellant moved for a mistrial. At a hastily convened conference at the bridge, Judge Chasanow gave the damage report. The impact, he observed, was "devastating" and "could not be repaired by a curative instruction." Before lowering the boats, one piece of business remained. Judge Chasanow sent the jury from the room and questioned Corporal Sutter about the accident. The corporal explained that he did not know that Mario Torney would not be present to testify. The final log entry recorded:

"I am going to assume it's negligence on Corporal Sutter's part and not anything more than negligence. I am sure it is negligence at this juncture."

Judge Chasanow then gave the order for mistrial. Hard by the bow at 11:58 a.m., the initial jeopardy went to the bottom.

The trial that was abandoned on July 10, 1981 was resumed, three days later, on July 13, again before Judge Chasanow and a jury. At the outset, the appellant sought to bar the retrial as prohibited double jeopardy. Judge Chasanow, who had of course been aboard for the events of July 10, made the following findings as he denied the motion:

"THE COURT: I don't think that there was any prosecutorial overreaching. There was certainly no attempt to abort the trial, would be no reason for the officer or the State to in any way attempt to abort the trial at that stage. I am satisfied that it was just an error in the judgment on the part of, perhaps, not as intelligent or experienced a police officer as we would like to find. Again, I don't think there was any deliberate overreaching. I am perfectly satisfied that it was not an attempt to gain an unfair advantage over the defendant, so for those reasons I am going to deny the motion."

The appellant now challenges that ruling as unconstitutional. In rejecting the contention, we hold that Judge Chasanow's assessment was eminently sound.

As we narrow the focus upon that limited quadrant of the larger double jeopardy field dealing with mistrial/retrial situations, we observe that those situations appear in two essential postures. The first is where the mistrial has been declared by the judge *sua sponte* or at the request of the State, either over the objection of the defendant or at least without the explicit acquiescence of the defendant. In those situations, the rule is that if there was a manifest necessity for the mistrial, retrial will not be barred; but if the trial was needlessly aborted, retrial will be barred. *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425

(1973); *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). That situation is not the one before us.

The other essential posture, and the one that is before us, is where the mistrial is declared at the request of the defendant. Ordinarily, a defense request for a mistrial is treated as a waiver of any double jeopardy claim. *United States v. Tateo,* 377 U.S. 463, 467, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *United States v. Dinitz,* 424 U.S. 600, 607-608, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). As a limited exemption from that otherwise foreclosing effect, however, there appeared in the Supreme Court cases a tender shoot of dicta (never before *Oregon v. Kennedy,* approaching an actual holding). The dicta first appeared in *United States v. Tateo, supra,* and seemed to say that the defense request for a mistrial would not necessarily inhibit a double jeopardy claim if the defense request had been prompted by "prosecutorial or judicial overreaching." In the wake of that dictum and similar dicta subsequently appearing in *United States v. Jorn, supra,* and *United States v. Dinitz, supra,* the appellate mills were glutted with questions of what varieties of judicial or prosecutorial misconduct constituted overreaching. An aberrant doctrinal strain appeared, again by way of dicta, in two Fifth Circuit cases [4] and then in a plurality holding in Pennsylvania.[5] It indicated that an error attributable to the "gross negligence" of the prosecutor would constitute such overreaching. Although seldom achieving any success, the defense contentions that seized upon that language have been legion.

In an effort to lay that ghost to rest with finality, we traced in *Tabbs v. State,* 43 Md.App. 20, 403 A.2d 796, the false doctrine to its source and exposed its invalid origins. The analysis of this Court in *Tabbs* became, in turn, the heart of

---

4. United States v. Beasley, 479 F.2d 1124 (5th Cir. 1973), and United States v. Kessler, 530 F.2d 1246 (5th Cir. 1976).

5. Commonwealth v. Bolden, 472 Pa. 602, 373 A.2d 90 (1977), later repudiated in Commonwealth v. Potter, 478 Pa. 251, 386 A.2d 918 (1978).

the prevailing brief for the State of Oregon in *Oregon v. Kennedy*. The Supreme Court there held not simply that gross negligence on the part of judge or prosecutor would not constitute overreaching, but that even intentional error might not, depending on the purpose with which the intentional error was committed. The Supreme Court looked back upon its earlier dicta and pointed out that in every instance, the dicta was aimed not only exclusively at intentional misconduct but, even more exclusively, at that limited variety of intentional misconduct consciously designed to force a defendant into requesting a mistrial. *United States v. Dinitz* had spoken not of prosecutorial misconduct generally but of prosecutorial misconduct perpetrated "in order to goad the [defendant] into requesting a mistrial." 424 U.S. at 611. *United States v. Tateo* referred not to "prosecutorial or judicial impropriety justifying a mistrial" generally but to those more limited situations where "that prosecutorial or judicial impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the accused." 377 U.S. at 468 n. 3. *United States v. Jorn* spoke not of "judicial or prosecutorial impropriety" generally but of "judicial or prosecutorial impropriety designed to avoid an acquittal." 400 U.S. at 485 n. 12. *United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), spoke of the defense request for the mistrial operating as a bar to a double jeopardy claim "so long as the Government did not deliberately seek to provoke the mistrial request." 449 U.S. at 130. In *Divans v. California,* 434 U.S. 1303, 98 S.Ct. 1, 54 L.Ed.2d 14 (1977), Justice Rehnquist, sitting as a Circuit Justice in denying a request for the stay of a second trial, spoke of overreaching conduct as that perpetrated "for the purpose of forcing the defendant to move for a mistrial." 434 U.S. at 1303.

The *Oregon v. Kennedy* analysis looked to the interest of the defendant being protected in the mistrial/retrial setting. It showed how that interest historically was the right of the defendant to stay with the original tribunal that had begun to try his case until the sweet or bitter end. It pointed out how a deliberate sabotaging of the trial designed to goad the defendant into moving for a mistrial interfered with that

right and why it must, therefore, be protected by the bar against a retrial. It pointed out, by way of contrast, that the right to a fair trial free from error, is protected not by a retrial bar but by the availability of a mistrial and the availability of appellate reversal. Ordinarily, when the prosecutor injects error into the trial, grievous as that may be, the sanction is mistrial or reversal. It is only where the prosecutor deliberately subverts the right of the defendant to stay with the original tribunal that the double jeopardy bar becomes the appropriate relief. In distinguishing not between grave error and lesser error and not between intended error and unintended error, but rather between deliberate error designed to accomplish Purpose A and deliberate error designed to accomplish Purpose B, the Supreme Court was emphatic, at 72 L.Ed.2d 424-425:

> "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial *absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.* A defendant's motion for a mistrial constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.' *United States v. Scott,* 437 U.S. 82, 93 (1978). Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, '[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error.' *United States v. Dinitz, supra,* at 609. *Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial* may a defendant raise the bar of Double Jeopardy to a second trial after having succeeded in aborting the first on his own motion." (Emphasis supplied).

What emerges is that we must look not to the error itself

and not to the plight of the defendant who has been afflicted by that error but rather to the intent with which the error was committed. Leaving to the side, for reasons of linguistic economy, the parallel problem of judicial misconduct, we are called upon to assess the motive of the prosecutor. When we speak of intentional misconduct, we are not speaking of a mere general intent to do the act. Absent the rare case of the Freudian slip or the muscular spasm, the prosecutor always intends (1) to ask the question, that turns out to have been erroneous; (2) to make the argument, that turns out to have been inflammatory; and (3) to introduce the evidence, that turns out to have been inadmissible. The double jeopardy law contemplates some specific intent to achieve a desired purpose above and beyond the mere general intent to do the erroneous act. It was of this distinction that Chief Judge Gilbert spoke in *Lee v. State, supra,* at 47 Md.App. 369-370:

> "What is meant by the *Bell* Court's use of 'intentional' is 'overreaching,' an act that 'contemplates a *specific intent* above and beyond the mere general intent.' It is the specific intent to commit a foul, the deliberate 'hitting below the belt' or the calculated 'personal foul' performed with the thought in mind that the foul might well be detected for what it is. By borrowing from the game of football for an analogy, we liken that specific intent to force a mistrial to a defensive back's wilful and deliberate interference with the offensive team's down field pass receiver. The defense knows that by performing the illegal act that constitutes the foul, he will probably be caught and his team penalized. Nevertheless, the offender prefers to take the penalty rather than give up the touchdown that most likely would occur were the foul not committed." (Emphasis in original).

What is encompassed by intentional misconduct, therefore, is not the mere general intent to do the act but, additionally, the special intent to attain some specific end thereby. There are a number of special intents that might attend the same general intent:

| | |
|---|---|
| *General Intent:* | To do the trial act that turns out to be error: |
| *Special Intents:* | 1. thinking it to be correct; |

2. not thinking about whether it is error or not (perhaps lawyerly negligence);

3. being cavalierly indifferent to error under circumstances where one would reasonably be expected to know that there is probably error (perhaps gross negligence);

4. knowing it to be error, but hoping to get away with it, thereby clinching a probable winner (deliberate "overkill" in a case the prosecutor has no desire to abort);

5. knowing it to be error, but desiring to "sabotage" a probable loser either 1) by snatching an unexpected victory from probable defeat if not caught, or 2) by getting caught, thereby provoking the mistrial, averting the probable acquittal and living to fight again another day. (A calculated sabotaging of a perceived "lost cause" in either event; an indifference to whether he is caught or not).

It is only the fifth of these special intents that will qualify under *Oregon v. Kennedy* to bar a retrial. It is not enough that the prosecutor has smuggled prejudicial contraband aboard the train hoping it will reach its destination; it is

required that he has deliberately accepted the high risk of derailing the train, either hoping for the derailment or indifferent to the possibility. To recognize this is not to countenance for a moment the other varieties of prosecutorial misfeasance. Special intents two, three and four are increasingly reprehensible and, barring a finding of harmless error, will be sternly redressed. The redress, however, is the declaration of the mistrial itself or the appellate reversal of the conviction. Many of the prosecutorial errors that trigger mistrials and reversals consist of grossly negligent and even deliberate conduct. The law has never looked upon the declaration of a mistrial and the appellate reversal as mild slaps upon the wrist, but has treated them as rigorous means for redressing even grossly negligent and deliberate misconduct. For weighty considerations that need not here be reiterated, our constitutional law has always permitted a retrial following such mistrial or reversal, *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *United States v. Tateo, supra,* save in the limited instance where the reversal is based upon the legal insufficiency of the evidence. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). When the prosecution suffers a mistrial or an appellate reversal, it is considered to have suffered a stern rebuke in terms of lost days, lost dollars, lost resources of many varieties and the lost opportunity to make the conviction stick. It is only in the Machiavellian situation where the prosecutor deliberately courts a mistrial, that the normal sanctions are self-evidently inadequate. A scheming prosecutor cannot be rewarded by being handed the very thing toward which he connives.

A defendant may well ask what difference it makes to him why the error was committed, since he suffers all the same. The answer is that from the parochial viewpoint of the defendant, it may make very little difference; but the defendant is not the only factor in the equation. Even from the vantage point of the defendant, moreover, there are several valuable but quite distinct interests at stake. The foremost is the

interest in receiving a fair trial. It is directly to protect this interest that we make available the sanctions of mistrial and reversal. The second interest is in keeping together a tribunal, once it is impaneled, until a verdict has been reached. This is the unique interest that is protected by the mistrial/retrial law. The two interests are, of course, related; but they are not identical. Even after error has been injected into a case, a defendant may prefer not to abort the trial, but to wait and see whether he may not achieve an acquittal even in the teeth of prejudicial error. An appeal is still available if the gamble fails. The defendant still maintains control. A skillful, counterpunching defense tactician may, moreover, turn flagrant prosecutorial misconduct to his advantage and wrest from an outraged jury an acquittal precisely because of that misconduct. There is a significant defense interest in keeping the trial upon the tracks quite apart from the interest in receiving a fair trial.

This difference in interests and the resultant difference in the ways our constitutional law guards these interests is admittedly an elusive concept; it is, however, one that bench and bar must master to forestall needless and endless litigation in this profligately overused corner of the field. There remain, of course, other lesser forms of prosecutorial misconduct: (1) the innocent mistake, (2) the mistake attributable to mere negligence and (3) the mistake attributable to gross negligence. Even at the extreme end of the reprehensibility spectrum, however, where the prosecutor has committed the deliberate foul, there is still this pivotal distinction between (1) seeking to win the game unfairly and (2), knowing the game is going awry, deliberately causing it to be cancelled and rescheduled. If the prosecutor wins the game unfairly, we make him replay it. When the prosecutor deliberately causes the game to be cancelled unfairly, we do not permit him to reschedule it. This distinction is what the Supreme Court sought to communicate, as it concluded its discussion in *Oregon v. Kennedy,* at 72 L.Ed.2d 427:

"[W]e do hold that the circumstances under which

such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial."

The error that caused the defendant to seek and obtain the mistrial in the case now before us did not remotely approach these outer limits of nefarious purpose. Indeed, the situation appears to have been one where the prosecutor was not at fault at all, but where the error was tossed into the hopper by a recklessly assertive witness. Judge Chasanow found that even as to that witness, the volunteering of the prejudicial hearsay was an enthusiastic blurt. Even if it had been otherwise, it would not have been attributable to the prosecutor. Whoever's mistake it was, moreover, there were no signs even mildly suggesting that the State sought to goad or provoke the appellant into moving for the mistrial. It was only evenhanded justice, therefore, to go forward with the retrial.

### The Other Contentions

We are underwhelmed by the appellant's remaining contentions. They are:

2. That it was prejudicial error to admit into evidence a replica of a .45 caliber pistol without the establishment of a proper chain of custody;
3. That his entire confession, as opposed to limited parts of it, was erroneously received in evidence; and
4. That the trial judge erroneously failed to dismiss the indictment which allegedly lacked the particularity required by Maryland Rule 711a.

The appellant complains that a proper chain of custody was not established with respect to the replica of a .45 caliber gun. A Prince George's County detective testified to recovering the replica from the appellant's apartment. The

rape victim testified that it "looked like the gun that [appellant] used." The detective who recovered the gun testified that it had not been altered or tampered with in any way since he recovered it and that he had turned it over directly to Detective Sutter. There was nothing improper about introducing the weapon into evidence. *Breeding v. State,* 220 Md. 193, 199, 151 A.2d 743; *Van Meter v. State,* 30 Md.App. 406, 414, 352 A.2d 850. The appellant does not suggest any way in which this toy gun was tampered with or any way in which tampering could arguably have made a difference. The contention smacks of rank opportunism.

The appellant also complains that his entire confession, including his statement about the theft of the weapon, should not have been received in evidence, as opposed to excised parts of that statement. Without belaboring it, we agree with Judge Chasanow that in his cross-examination of State's witness Pierre Torney, appellant's counsel opened the subject up and made the remaining portions of the statement, which had not theretofore been introduced, relevant and probative. *Piesner v. State,* 236 Md. 137, 202 A.2d 585.

The appellant's final contention is that the indictment did not describe the rape "as particularly as possible [in terms of] the time and place of the offense." *Bonds v. State,* 51 Md.App. 102, 442 A.2d 572, is clear authority that the indictment for rape in this case, specifying Prince George's County as the place and specifying October 22, 1980 as the time, was as detailed as an indictment need be. It is, once again, noteworthy that no defense was mounted nor defense theory argued suggesting that greater particularity in the charging document was of any significance to the defense of this case. Again, we have the uncomfortable feeling that the appellant is grasping for any technicality, material or not.

> *Judgment affirmed; costs to be paid by appellant.*