IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0521-05






EX PARTE JAMES S. MASONHEIMER, Appellee






ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW


AND STATE'S CROSS-PETITION FOR DISCRETIONARY REVIEW


FROM THE ELEVENTH COURT OF APPEALS


TAYLOR COUNTY





 Cochran, J., filed a dissenting opinion.


O P I N I O N 



 I most respectfully dissent. 

 Although I agree that this particular scenario might fit snugly within the spirit of
Oregon v. Kennedy, (1) it does not fit within the letter of that law. But we are not free to stray
into the spirit of the law. We are bound to follow the letter of the Supreme Court's law on
federal constitutional matters until and unless that court reassesses or refines its position on
double jeopardy as set out in Kennedy. The holding in Kennedy is crystal clear: double
jeopardy bars a retrial only if the prosecutor commits manifestly improper conduct with the
intent to goad the defendant into moving for a mistrial. (2) This case, however, involves a
prosecutor who, it is asserted, intends to "win at any price" before a first jury, not one who
intends to "get rid of this jury" so that he would have a better chance to win before a second
one. The result is the same-the defendant loses his right to a fair trial before his chosen
jury-but the prosecutor's "foul" intent is different, and, under Kennedy, that distinction is
crucial for double-jeopardy purposes.

 Some state courts, finding the reasoning and result in Kennedy unsatisfactory, have
chosen to interpret their own state constitutions more broadly than the Supreme Court did in
Kennedy to reach what they consider a more desirable result. (3) For ten years Texas did as
well. (4) We have only recently returned to the federal double-jeopardy fold and its "bright
line" Kennedy standard. (5) 

 One of the problems with deciding cases on independent state constitutional grounds
is that the Supreme Court is not given the opportunity to reassess and refine the federal
constitutional standard when state courts, dissatisfied with a purportedly parsimonious
federal standard, create a different rule under their own constitutions. Kennedy was decided
twenty-five years ago. The Supreme Court is not averse to reassessing its prior precedent
when appropriate, (6) and this case (or another like it) might provide a suitable opportunity to
consider a refinement of its "bright-line" rule in Kennedy. But until the Supreme Court does
so, I cannot conclude that federal double-jeopardy principles bar yet another trial in this case.

I.


 The trial judge in this pretrial habeas corpus proceeding (7) found that the prosecution
had "recklessly" (8) failed to disclose three crucial items of exculpatory evidence in violation
of Brady v. Maryland: (9)

 1. Immediately after the shooting, Mr. Masonheimer told a neighbor, Mr.
Marshall, that he had shot "Bo" Sanchez, his daughter Lucy's former
boyfriend because Sanchez had threatened Lucy, and "it was either him or
her." (10)

 

 2. Billy Williams, Lucy's former husband, told investigators that Lucy had called
him the night before the shooting to tell him about Sanchez's dangerous and
threatening behavior. Lucy "broke down," and said that she thought Sanchez
had put dirt in the gas tank of her car. Billy told her to go to the police and get
a restraining order. (11)


 3. While cleaning up Sanchez's garage apartment behind Lucy's home, John
Upchurch, one of Sanchez's friends, found several syringes and vials hidden
inside an antique Coke machine. Trish Duque, a registered nurse, was helping
Mr. Upchurch in the clean-up, and she said the vials contained steroids. (12)


 The lead prosecutor's repeated failure to turn over exculpatory material (material
which he must have known was crucial because the defense attorney had, before trial, clearly
explained his self-defense and defense-of-daughter theory on the record), coupled with his
deliberate attempt to prevent Mr. Marshall from testifying about Mr. Masonheimer's
spontaneous statement immediately after the shooting, (13) are objective facts that support the
habeas judge's factual finding that the lead prosecutor was, at a minimum, "reckless." 

 I agree with the majority that these objective facts support a finding that the lead
prosecutor acted "with the specific intent to avoid the possibility of an acquittal." (14) His
conduct of intentionally depriving the defense of obviously exculpatory evidence during the
first trial was "manifestly improper." But these facts and circumstances do not demonstrate
that the lead prosecutor was motivated by a desire to "goad" the defense into requesting a
mistrial. Instead, it is a fair conclusion that he was acting with the intent to "win at any
price" a trial that, had he turned over the Brady material, he likely would have lost. These
objective facts support the defense attorney's position at the habeas hearing that the lead
prosecutor "got caught," not once, not twice, but three separate times in deliberately failing
to turn over exculpatory evidence to the defense. This repeated misconduct led to two
separate mistrials. (15) 

II.


 The constitutional question is whether the double-jeopardy clause of the United States
Constitution bars a retrial if (1) the lead prosecutor intended to "sabotage" the fairness and
accuracy of a first trial by hiding exculpatory evidence, and (2) that manifestly improper
misconduct required the defendant to request and obtain a mistrial.

 At least one state court has suggested that the double-jeopardy principles expressed
in Kennedy should bar a retrial when the prosecutor "sabotages" the first trial whether he
intends to goad the defendant into requesting a mistrial or whether he simply intends to
obtain a conviction by "foul means," but got caught at it. (16) 

 The double-jeopardy clause "'affords a criminal defendant a valued right to have his
trial completed by a particular tribunal.'" (17) But, said the Supreme Court in Kennedy,
"[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if
sufficient to justify a mistrial on [a] defendant's motion . . . does not bar retrial absent intent
on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy
Clause." (18) The question that the Supreme Court has not addressed in the twenty-five years
since Kennedy is whether there is any degree of intentional prosecutorial "harassment or
overreaching" which, though intended to win a trial it would probably otherwise lose, is
covered by the mistrial prong of the Double Jeopardy Clause. If successful "goading" into
a mistrial results in a bar against retrial, why not unsuccessful "sabotage" which results in
a mistrial? It would seem that in both instances the prosecutor intended to subvert the
protections afforded by the Double Jeopardy Clause: a reasonably fair trial before the chosen
factfinder.

 It seems to me that this extension is no less of a "bright-line" rule than that set out in
Kennedy. Both would require the trial judge to find that the prosecutor's conduct was
manifestly improper-committed with specific "foul" intent (19) to avert an otherwise likely
acquittal from the chosen factfinder. (20) The difference is only between a "goading" or a
"sabotaging" intent. It seems to me that the issue in Kennedy concerned the brightness of the
"bright-line" rule concerning the prosecutor's "foul" intent, not whether that intent was
specifically directed toward making the defendant request a mistrial or toward "winning at
any price" including intentional sabotage. (21)

 There might not be a constitutionally meaningful distinction between intentionally
"goading" the defendant into requesting a mistrial and intentionally "sabotaging" the
defendant's right to a fair trial by prosecutorial foul play when either results in a mistrial
granted for "manifest necessity." But only the United States Supreme Court can answer that
question. 

Filed: March 21, 2007

Publish 
1. 456 U.S. 667 (1982).
2. Id. at 676, 679.
3. See, e.g., People v. Batts, 68 P.3d 357, 665-66 (Cal. 2003) (holding that the double
jeopardy clause of the California Constitution bars retrial following the grant of a defense-requested mistrial when the prosecution either intentionally goaded the defendant into requesting
a mistrial or intentionally committed misconduct believing that the defendant would otherwise be
acquitted); Pool v. Superior Court, 677 P.2d 261, 271-72 (Ariz. 1984); State v. Rogan, 984 P.2d
1231, 1249 (Haw. 1999); State v. Breit, 930 P.2d 792, 803-04 (N.M. 1996); State v. Kennedy,
666 P.2d 1316, 1326 (Or. 1983); Commonwealth v. Smith, 615 A.2d 321, 325 (Pa. 1992).
4. See Bauder v. State, 921 S.W.2d 696, 699 (Tex. Crim. App. 1996) (interpreting the
Texas constitutional double jeopardy standard more broadly than the corresponding federal
provision to include "reckless" misconduct and holding that retrial would be barred "when the
prosecutor was aware of but consciously disregarded the risk that an objectionable event for
which he was responsible would require a mistrial at the defendant's request").
5. Ex parte Lewis, ___ S.W.3d ___, No. PD-0577-05, 2007 Tex. Crim. App. LEXIS 33
(Tex. Crim. App., January 10, 2007).
6. See, e.g., Roper v. Simmons, 543 U.S. 551 (2005) (reconsidering its holding in Stanford
v. Kentucky, 492 U.S. 361 (1989), and holding that the Eighth and Fourteenth Amendments bar
execution of those under 18 when they committed a capital offense); Atkins v. Virginia, 536 U.S.
304 (2002) (reassessing its decision in Penry v. Lynaugh, 492 U.S. 302 (1989), and holding that
the Eighth and Fourteenth Amendments bar execution of those who are mentally retarded);
Lawrence v. Texas, 539 U.S. 558 (2003) (reconsidering its holding in Bowers v. Hardwick, 478
U.S. 186 (1986), and holding that the Fifth and Fourteenth Amendments protect private adult
consensual sexual relations between members of the same sex from criminalization).
7. The judge presiding over the habeas hearing was not the same judge who had presided
over the original trial and mistrial, but he did preside over the second trial and mistrial. 
8. Because the trial judge was following the then-current Texas constitutional standard set
out in Bauder, he did not make specific findings on whether the prosecution team acted
"intentionally" under Kennedy. Although the objective facts in this record support the majority's
conclusion that the first prosecutor acted intentionally, I would have remanded the case for
further factual findings on this issue.
9. 373 U.S. 83 (1963).
10. Mr. Marshall gave a written statement to the police with his version of Mr.
Masonheimer's statement. This written statement was not given to the defense and the record
from the first trial shows that the lead prosecutor deliberately cut Mr. Marshall off when he tried
to testify to Mr. Masonheimer's exculpatory explanation.
11. Despite the judge's pretrial order to turn over all Brady material, his order during trial
when he discovered that Mr. Marshall's exculpatory statement had not been turned over, and his
order to re-examine the entire file for any other possible Brady material, the prosecution team did
not give Billy Williams's written statement to the defense until confronted at a pretrial hearing
shortly before the second trial.
12. The defense attorney established that the lead prosecutor and his investigator had
interviewed Mr. Upchurch some two months before the first trial. Mr. Upchurch told them of his
discovery. Both the prosecutor and investigator took "copious" notes during this interview. 
They then called Trish Duque to confirm the discovery of the vials and her belief that they
contained steroids. This information, though corroborating the defense theory that Sanchez had
recently become violent and aggressive because of his steroid use, was not given to the defense
until the middle of the second trial. Despite numerous Brady requests, orders, and admonitions
from two trial judges, the State inexplicably failed to produce three obviously exculpatory items
of evidence. Even more ominous, the defense suggests that there may be more unproduced
exculpatory materials: the prosecution's investigator testified at the habeas hearing that Police
Chief Bob Jones took pictures inside Sanchez's apartment, but those photographs have
mysteriously disappeared. 
13. The lead prosecutor specifically asked Mr. Marshall what Mr. Masonheimer told him
immediately after the shooting. Mr. Marshall responded, "Yes, sir. I asked him if he did it. He
said yes. He said that he had threatened-" At that point, the prosecutor interrupted with another
question instead of allowing Mr. Marshall to complete his sentence. Mr. Marshall's written
statement shows that Mr. Masonheimer told him that Sanchez had threatened his daughter. "It
was either him or her."
14. Majority slip op. at 19.
15. The first mistrial was actually declared after a death in the second prosecutor's family,
but it was indirectly caused by the lead prosecutor's misconduct. The lead prosecutor's failure to
turn over Mr. Marshall's statement caused the defense to request a mistrial. The trial judge
declined to immediately grant a mistrial and instead granted a continuance to decide whether the
trial could later proceed before the same jury if all exculpatory evidence were properly produced
in the interim. As is now known, the additional exculpatory material was not produced. But
before the trial judge could make any final decision about the mistrial requested for the Brady
violation, the death of the second prosecutor's family member necessitated a mistrial.
16. See West v. State, 451 A.2d 1228, 1235 (Md. Ct. Spec. App. 1982) (stating that Oregon
v. Kennedy would bar retrial if the prosecutor committed misconduct "knowing it to be error, but
desiring to 'sabotage' a probable loser either 1) by snatching an unexpected victory from
probable defeat if not caught, or 2) by getting caught, thereby provoking the mistrial, averting the
probable acquittal and living to fight again another day. (A calculated sabotaging of a perceived
'lost cause' in either event; an indifference to whether he is caught or not.)"). 
17. Kennedy, 456 U.S. at 671-72 (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)).
18. Id. at 675.
19. As poetically put by Chief Judge Gilbert of the Maryland Court of Special Appeals, this
is 

 the specific intent to commit a foul, the deliberate "hitting below the belt" or the
calculated "personal foul" performed with the thought in mind that the foul might
well be detected for what it is. By borrowing from the game of football for an
analogy, we liken that specific intent to force a mistrial to a defensive back's
wilful and deliberate interference with the offensive team's down field pass
receiver. The defense knows that by performing the illegal act that constitutes the
foul, he will probably be caught and his team penalized. Nevertheless, the
offender prefers to take the penalty rather than give up the touchdown that most
likely would occur were the foul not committed.

Lee v. State, 423 A.2d 267, 269 (Md. Ct. Spec. App. 1980).
20. Although "it hurts the defendant just as much to have prejudicial blasts come from the
trumpet of the angel Gabriel," United States v. Nettl, 121 F.2d 927, 930 (3d Cir. 1941), the
Kennedy double-jeopardy bar applies only when those prejudicial blasts were intended to subvert
the defendant's valuable right to have his fate fairly decided by his chosen factfinder. Just as a
dog knows the difference between being kicked and being stumbled over, a trial judge must,
under Kennedy, determine, from the objective facts and circumstances, whether the prosecutor's
misconduct was intentionally "below the belt" or merely negligent.
21. See Kennedy, 456 U.S. at 675 (stating that a rule "that examines the intent of the
prosecutor . . . is a manageable standard to apply").