ACCEPTED
07-14-00335-CR
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
1/30/2015 11:57:02 PM
Vivian Long, Clerk

NO. 07-14-00335-CR

IN THE
COURT OF APPEALS
SEVENTH JUDICIAL DISTRICT
AMARILLO, TEXAS

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
1/30/2015 11:57:02 PM
VIVIAN LONG
CLERK

_____

RAUL CONSTANCIO
V.
THE STATE OF TEXAS

_____

ON APPEAL FROM THE COUNTY COURT OF LAW NUMBER TWO
OF LUBBOCK COUNTY, TEXAS
CAUSE NO. 2013-475,785

_____

BRIEF FOR THE STATE

_____

MATTHEW D. POWELL
Criminal District Attorney
Lubbock County, Texas

JESSICA SCHNEIDER
AARON MONCIBAIZ
Assistant Criminal District Attorneys
(Trial Attorneys)

JEFFREY S. FORD
Assistant Criminal District Attorney
Lubbock County, Texas
State Bar No. 24047280
P.O. Box 10536, Lubbock, TX 79408
Phone (806)775-1166
FAX: (806)775-7930
E-mail: JFord@co.lubbock.tx.us
(On appeal)
**ATTORNEY FOR THE STATE**

ORAL ARGUMENT REQUESTED
(*Only* if Granted to Appellant)

## Identity of Parties and Counsel

**Appellant:**

Raul Constancio

**Appellant's trial attorneys**:

Sarah B. Johnson, Law Office of Sarah Johnson, 1213 Avenue K, Lubbock, TX 79401; phone (806)771-3933; fax (806)771-3935

Russell "Rusty" Gunter, Law Office of Russell I. Gunter, II, 1213 Avenue K, Lubbock, TX 79401; phone (806)771-3933; fax (806)771-3935

**Appellant's appellate counsel:**

Allison Clayton, The Law Office of B. Allison Clayton, P.O. Box 64752, Lubbock, TX 79464; phone (806)773-6889; fax (888)688-4515

**State of Texas:**

At trial:

Jessica Schneider and Aaron Moncibaiz, Assistant Criminal District Attorneys, Lubbock County Criminal District Attorney's Office, P.O. Box 10536, Lubbock, Texas 79408; phone (806)775-1100; fax (806)775-7930

On appeal:

Jeffrey S. Ford, Assistant Criminal District Attorney, Lubbock County Criminal District Attorney's Office, P.O. Box 10536, Lubbock, Texas 79408; phone (806)775-1166; fax (806)775-7930

**Trial Judge:**

Honorable Drue Farmer, Presiding Judge, County Court at Law No. 2 of Lubbock County, Texas, Lubbock County Courthouse, 904 Broadway, Suite 402, Lubbock, TX 79401

# Table of Contents

                                                                          **PAGE**

Identity of Parties and Counsel ...............................................................................i

Table of Contents ............................................................................................. ii

Table of Authorities ........................................................................................iv

Statement of the Case....................................................................................... vii

Statement of the Facts......................................................................................1

     *Motions in Limine & Evidentiary Hearing*……………………………….2

     *Statements at Issue*…………………………………………………………..3

       *a) First Objectionable Statement*…………………………………….3

       *b) Second Objectionable Statement*…………………………………4

       *c) Third Objectionable Statement*……………………………………5

     *Hearing on Motion for Mistrial*…………………………………………..5

     *Hearing on Application for Writ of Habeas Corpus*………………………...6

Summary of the Argument....................................................................................9

Argument and Authorities…………………………………………………....11

Sole Issue Presented: Appellant argues that the prosecution intentionally goaded him into requesting a mistrial by "egregiously and knowingly violating trial court's ruling," thereby rendering any retrial jeopardy-barred. Contrary to Appellant's contentions, the record reflects that the prosecutor's actions were the result of

accident or mistake rather than intentional misconduct designed to "goad" the defense into moving for a mistrial. The trial court implicitly determined that the prosecutors provided a reasonable explanation for their actions when it declined to order that retrial is jeopardy barred, a ruling that was not an abuse of discretion in light of the record evidence showing that the prosecutors had "good faith" reasons for their actions. Did the trial court abuse its discretion in finding that the prosecution did not intentionally provoke Appellant into requesting a mistrial?....11

*Standard of Review*……………………………………..………………………..11

*Discussion*……………………………………………………………………….12

*After viewing the trial court's implied findings regarding the prosecutors' intent in the light most favorable to the trial court's ruling, did the trial court abuse its discretion in denying the application for writ of habeas corpus?*.....................................................................15

I. *First Instance: Testimony by Apartment Manager*........................17

II. *Second Instance: Testimony Regarding Admitted Lease Violation*…………………………………………………………….26

III. *Third Instance: Police Officer's Statement on Cross-Examination*……………………………………………………...37

*Conclusion*……………………………………………………………………47

Conclusion and Prayer ...................................................................................56

Certificate of Service ....................................................................................56

Certificate of Compliance.………………………………………………………57

**CONSTITUTIONAL PROVISIONS**                                                       **PAGE**

TEX. CONST. Art. I, § 14……………………………………………………6, 12, 47

U.S. CONST. amend. V…………………………………………………...6, 12, 47

U.S. CONST. amend. XIV…………………………………………………...6

**U.S. SUPREME COURT CASE LAW**

*Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)..........................................................................12, 13, 15-17, 34, 46-48, 55

**TEXAS CASE LAW**

*Bowen v. State*, 131 S.W.3d 505 (Tex. App.—Eastland 2004, pet. ref'd)..20, 21, 26

*Ex parte Bauder*, 2 S.W.3d 376 (Tex. App.—San Antonio 1999, pet. ref'd)…….24

*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005)……………………11

*Ex parte Chavez*, No. 02-13-00310-CR, 2014 WL 491813, 2014 Tex. App. LEXIS 1409 (Tex. App.—Fort Worth Feb. 6, 2014, no pet.) (*not designated for publication*)……………………………………………………………………..52

*Ex parte Cruz*, 350 S.W.3d 166 (Tex. App.—San Antonio 2011, no pet.).21, 22, 24

*Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007)..............................*passim*

*Ex parte Macias*, No. 08-12-00192-CR, 2014 WL 5393042, 2014 Tex. App. LEXIS 11622 (Tex. App.—El Paso Oct. 22, 2014, no pet.) (*not designated for publication*)……………………………………………………………………..34

*Ex parte Masonheimer*, 220 S.W.3d 494 (Tex. Crim. App. 2007)…………………………………………………………12, 14-17, 46-48,

*Ex parte Peterson*, 117 S.W.3d 804 (Tex. Crim. App. 2003), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007).12, 36, 37, 52

*Ex Parte Washington*, 168 S.W.3d 227 (Tex. App.—Fort Worth 2005, no pet.)..................................................................................41, 42, 46, 47, 52

*Ex parte Wheeler*, 203 S.W.3d 317 (Tex. Crim. App. 2006)……..12, 31, 32, 34, 49

*State v. Guerrero*, 400 S.W.3d 576 (Tex. Crim. App. 2013)…………………..11

*Hill v. State*, 79 S.W.3d 682 (Tex. App.—Amarillo 2002, pet. ref'd)………..12, 48

*Sandifer v. State*, 233 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2007, no pet.)...34

*Washington v. State*, 326 S.W.3d 701 (Tex. App.—Houston [1st Dist.] 2010, no pet.)………………………………………………………………….47

## TEXAS RULES AND STATUTES

TEX. CODE CRIM. PROC. ANN. art. 1.10…………………………………………….6

TEX. PEN. CODE ANN. § 12.43………………………………………………….15

TEX. PEN. CODE ANN. § 12.43(b)(2)…………………………………………….53

TEX. PEN. CODE ANN. § 30.05(a)(1)…………………………………………….33

TEX. R. APP. P. 3.2……………………………………………………………….vi

TEX. R. EVID. 403……………………………………………………………….35

TEX. R. EVID. 404(b)……………………………………………………………….35

## OTHER STATES' CASELAW

*West v. State,* 52 Md. App. 624, 451 A.2d 1228 (1982)………………………16, 17

NO. 07-14-00335-CR

IN THE
COURT OF APPEALS
SEVENTH JUDICIAL DISTRICT
AMARILLO, TEXAS

_____

RAUL CONSTANCIO
V.
THE STATE OF TEXAS

_____

BRIEF FOR THE STATE

_____


**To the Honorable Court of Appeals**:

The State of Texas, the prosecuting authority in Cause No. 2013-475,785 in the County Court of Law No. 2 of Lubbock County, and Appellee before the Seventh Court of Appeals, respectfully submits this brief in reply to the brief filed by Appellant appealing the trial court's denial of his Application for Writ of Habeas Corpus. The parties will be referred to as "Appellant" and "State."[1]

_____

[1] TEX. R. APP. P. 3.2.

## Statement of the Case

Appellant was charged by information on September 5, 2013, with the offense of criminal trespass of a habitation, which was later amended (on May 22, 2014) to allege the offense of criminal trespass of property. (Clerk's Record (CR) pp. 12, 67-68, 70). A one-day jury trial was held on July 21, 2014. Though both sides rested that day, the Court's Charge was not given to the jury. (Reporter's Record (RR) vol. 4, pp. 99-100). The following day, July 22, 2014, the trial court granted a mistrial. (RR vol. 5, pp. 15-17).[2] Appellant filed an *Application for Writ of Habeas Corpus Seeking Relief From Double Jeopardy* (and a brief in support and an amended brief), alleging that retrial was barred on double jeopardy grounds. (CR pp. 93-142) (RR vol. 6, pp. 4-5). The trial court denied habeas relief following a hearing on August 13, 2014. (CR p. 153) (RR vol. 6, p. 23). This appeal followed. (CR pp. 144-45).

---

[2] As noted in Appellant's Brief, the volume of the Reporter's Record titled "Hearing on Motion for Mistrial," which was improperly labeled as "Volume 7 of 7" in the Record (Appellant's Br. at vii), will be referred to as "Volume 5" for purposes of this brief.

## Statement of Facts

Appellant was living with his mother, Estella Ledesma (Ledesma), in the Courtyards at Monterey apartment complex in August of 2012. (RR vol. 4, pp. 28, 32. 80). After receiving several complaints, the apartment complex management issued a lease violation against Ledesma for letting Appellant live in her apartment after complaints had been received against him. She was informed that he was not supposed to be there since he was not on the lease and did not have permission to be on the property. (RR vol. 4, pp. 32, 35, 37-38, 49, 51-52, 56-57, 61).

On August 13, 2012, James Blanda asked Officer Todd Overholser—who was working off duty as a security officer at the apartment complex—to criminally trespass Appellant from the apartment complex. Officer Overholser provided Appellant notice that he was not allowed to return to the premises, with Blanda also telling Appellant he could not return to the premises. (RR vol. 4, pp. 38-39, 57, 62, 66, 68-69, 93-94). Appellant expressed understanding that he was not to return to the premises. (RR vol. 4, pp. 38-39, 62, 69). Ledesma drove Appellant off of the property and reported back that he had moved out. (RR vol. 4, p. 69).

Just a little over a year after the criminal trespass notice was given, on August 19, 2013, Overholser saw Appellant sitting in a truck on the apartment complex premises. (RR vol. 4, pp. 70-71, 83-84). Overholser placed Appellant under arrest for criminal trespass. (RR vol. 4, pp. 39, 71-72, 85).

1

*Motions in Limine & Evidentiary Hearing*

A few months prior to trial (on March 13, 2014), Appellant filed his first motion in limine. (CR pp. 42-45). Among the other things mentioned in the motion was that the State was not to elicit any oral or written statements allegedly made by Appellant or any extraneous offenses or possible offenses without first taking the matter up outside the jury's presence. (CR p. 43). The motion in limine was granted. (CR p. 46).

On the day of trial, Appellant bench-filed his second motion in limine. (CR pp. 84-86) (RR vol. 3, p. 5). Appellant's second motion in limine requested that the State not mention, discuss, or allude to any statement that Appellant was "attempting to lure small children into the apartment" or that he was "dangerous to other residents." (CR p. 84, Section I(A-B)). The State said that it had no objection to the motion in limine being granted, but believed that some of the statements and incidents that were enumerated in Sections A through D could be relevant during the case-in-chief (but said that it would not go into the statements and incidents in opening statement) to show why Appellant was previously trespassed from the property. (RR vol. 3, pp. 5-6). The trial court granted the motion in limine, stating that there would be a motion in limine in place regarding why Appellant was trespassed from the property. (RR vol. 3, p. 6).

Immediately after the information was read, but before opening statements, a brief hearing was held outside the jury's presence with Officer Todd Overholser testifying regarding complaints against Appellant that led to his being trespassed from the property. (RR vol. 4, pp. 7-20). Following his testimony, the trial court ruled that the specific nature of the complaints about why he was initially trespassed from the property were inadmissible at that point, but that the State could present testimony that complaints were made, which was the basis for Appellant's being excluded from the property. (RR vol. 4, p. 20).

*Statements at Issue*

During trial, there were three objectionable statements that formed the basis for Appellant's assertions in his application for writ of habeas corpus that retrial was barred on double jeopardy grounds. Each statement at issue will be discussed separately below.

*a) First Objectionable Statement*

James (Jim) Blanda was called as the first State's witness at trial. He was employed at the Courtyards at Monterey as the manager of the apartment complex. (RR vol. 4, p. 28). He said that he was familiar with Appellant and identified him in court. (RR vol. 4, p. 29). He was then asked how he initially became familiar with Appellant and if he had ever had any complaints against Appellant, to which he replied "[b]asically two little girls - - oh, not too much detail" and (after a few

3

more questions) "[a]bout Mr. Constancio trying to - - lure." After the "lure" statement, the jury was excused. (RR vol. 4, pp. 29-30). The trial court acknowledged that the prosecutors had not had time to talk to Blanda about not discussing the exact complaints against Appellant that led to the trespass and admonished Blanda accordingly. (RR vol. 4, pp. 30-31). Appellant asked for a curative instruction to the jury—which was given. Appellant then moved for a mistrial, which was denied. (RR vol. 4, pp. 31-32).

### b) Second Objectionable Statement

When questioning of Blanda resumed, he was asked by the State about the lease violation given to Ledesma for allowing Appellant to be on the premises. (RR vol. 4, pp. 32-33, 35). When the State sought to admit the *Notice of Lease Violation* as State's Exhibit 6, Appellant took Blanda up on voir dire. After a brief voir dire, Appellant objected that the proper predicate had not been shown. The trial court overruled the objection and allowed State's Exhibit 6 to be admitted. (RR vol. 4, pp. 33-35). After State's Exhibit 6 was admitted, the State asked Blanda about the lease violation, and in particular what the violation was. Blanda replied that the violation was "[u]nauthorized drunk man and dangerous to other residents." (RR vol. 4, pp. 35-36). The trial court sustained the defense objection to the last statement, ordering that the "dangerous to other residents" portion of the *Notice* be redacted. (RR vol. 4, pp. 36, 54-55; vol. 7, State's Exhibits 6, 6A).

Appellant then renewed his request for a mistrial. The trial court overruled Appellant's motion, but instructed the jury to disregard Blanda's last statement. (RR vol. 4, pp. 36-37).

### c) Third Objectionable Statement

The third statement was elicited during Appellant's cross-examination of Officer Overholser. Appellant asked Overholser if he told him, following the arrest, that he would be arrested if he returned to the property. Overholser, expressing confusion at the question, was asked to look at his report to refresh his recollection. While looking at his report, he stated, "Oh, I'm sorry. Oh, I see at the end where he told me he'd beat my ass if he saw me again." (RR vol. 4, pp. 85-86). Appellant then objected and asked for a mistrial, arguing that the last statement was covered by the first motion in limine and was nonresponsive to the question asked. (RR vol. 4, pp. 86-87, 90). After hearing argument from the parties, the trial court denied the motion for mistrial and instructed the jury to disregard the last answer given by the witness. (RR vol. 4, pp. 90-91).

### Hearing on Motion for Mistrial

Following additional questioning of Officer Overholser by both parties, both sides rested. (RR vol. 4, pp. 91-99). The following day, the trial court revisited the matter of whether a mistrial should be granted. (RR vol. 5, p. 4). Appellant made a "cumulative effects" argument, arguing that mistrial should be granted

based on the "four distinct answers" that were given "by two witnesses in direct violation of two motions in limine" in "a span of less than two hours." (RR vol. 5, pp. 4-7, 14-15). The State argued that none of the statements warranted a mistrial since the trial court gave instructions to the jury to disregard each statement. (RR vol. 5, pp. 8-13). After hearing both sides, the trial court ordered a mistrial based on the cumulative effect of the statements and because of the short length of testimony (approximately two-and-a-half hours of testimony). (RR vol. 5, pp. 15-19). The trial court clarified that mistrial was being granted based on the defense motion for mistrial, and that the State would be allowed to retry Appellant. (RR vol. 5, p. 17).

*Hearing on Application for Writ of Habeas Corpus*

Appellant filed an *Application for Writ of Habeas Corpus Seeking Relief from Double Jeopardy* on August 11, 2014. (CR pp. 93-95). In the Application, Appellant alleged that "[t]his restraint is unlawful because the trial of Mr. Constancio for this offense is barred by the Double Jeopardy Clauses of the Fifth and Fourteenth Amendments of the United States Constitution, Article 1, § 14 of the Texas Constitution, and Article 1.10 of the Texas Code of Criminal Procedure." (CR p. 93). He requested that following a hearing, the trial court a writ of habeas corpus ordering his release. (CR p. 94).

A hearing was held on August 13, 2014, before the Honorable Drue Farmer, the same judge who presided over Appellant's trial. Defense counsel argued that the State "chose to break [the] rules" that were "clearly defined" by the trial court. (RR vol. 6, p. 7). With regards to the first two statements, she argued that they were "intentional statements, intentional misconduct by the [S]tate." (RR vol. 6, p. 8). She argued that the third statement was due to the State's failure to admonish its witnesses. *Id.*

Defense counsel also made additional allegations as to why the prosecutor's conduct was intentional. First, she argued that because there was alleged error in the State's enhancement notice that the State was not made aware of until the day that trial was set to begin, the State was not going to be able to enhance Appellant with the prior conviction. (RR vol. 6, pp. 10-11). Second, she argued that "[t]rial was just not going as they expected" because the State had intended to present the prejudicial information before the jury, but was denied the ability to do that by the "unexpected motion in limine" and the trial court's "clear order." (RR vol. 6, p. 11). Lastly, she argued that, although mistrial was requested by the defense, it was not ultimately her decision to request a mistrial, but rather was one "intentionally provoked by the State. (RR vol. 6, pp. 11-12).

The prosecutor responded to each individual statement. With regards to the first statement, she acknowledged that they had not sufficiently admonished

Blanda, but it was because the second motion in limine was filed and ruled on right before he took the stand. When she asked the question about what Blanda had received complaints "about," she was looking for him to say Appellant's name, not to get into the substantive nature of the complaints. (RR vol. 6, p. 13-14). With regards to the second statement, she pointed out that the defense had been in possession of the lease violation document for several months prior to trial and did not object to the substance of the document, only to its predicate. (RR vol. 6, pp. 14-15). With regards to the third statement, she noted that Overholser had been admonished about the motion in limine before he took the stand. (RR vol. 6, pp. 15-16). The State dispelled the last of Appellant's arguments by urging that it was not a calculated move on the part of the State to elicit any improper testimony, and that the mistrial was ultimately Appellant's decision, in that the State did not want a mistrial. (RR vol. 6, p. 16).

The trial court denied the request for a writ of habeas corpus, but acknowledged that Appellant was entitled to an interlocutory appeal. (CR pp. 153-54) (RR vol. 6, p. 23).

## Summary of the Argument

In his sole issue on appeal, Appellant argues that the prosecution intentionally goaded Appellant into requesting a mistrial, thereby rendering a retrial jeopardy-barred. Where a mistrial is declared at the request of the defendant, retrial is barred by double jeopardy only in circumstances in which the prosecution's conduct was intended to provoke or "goad" the defendant into requesting the mistrial.

Appellant's support for his assertion that the State intended to provoke the defense into requesting a mistrial is the admission of three statements that were admitted at trial in violation of two separate motions in limine and the trial court's ruling following an evidentiary hearing. But, the record reflects that the admission of the statements was the result of inadvertence or mistake—not deliberate misconduct on the part of the prosecutors. The first statement was inadvertent in that the State was expecting the answer to be Appellant's name, not the nature of the complaints involving Appellant. The second statement was given under the mistaken belief that, because the document had been admitted in full, the statements therein were admissible. Finally, the last statement was given in response to a question by Appellant to one of the State's witnesses, an answer that cannot be considered attributable to the prosecutors since there is no evidence of

collusion between the prosecutors and the police officer witness to get him to give the (arguably) non-responsive answer.

The record does not show that the prosecutors acted with *intent* to provoke Appellant into moving for a mistrial—which is the standard as required by both the U.S. Supreme Court and the Texas Court of Criminal Appeals before a retrial will be jeopardy-barred (since Appellant is not arguing that the State's actions were done with the intent to avoid the possibility of an acquittal). The trial court did not abuse its discretion in determining that the prosecutors did not intend to provoke or goad the defense into requesting a mistrial. Therefore, the trial court did not err in denying Appellant's pretrial application for writ of habeas corpus.

<u>Arguments and Authorities</u>

<u>Sole Issue Presented</u>

Appellant argues that the prosecution intentionally goaded him into requesting a mistrial by "egregiously and knowingly violating trial court's ruling," thereby rendering any retrial jeopardy-barred. Contrary to Appellant's contentions, the record reflects that the prosecutor's actions were the result of accident or mistake rather than intentional misconduct designed to "goad" the defense into moving for a mistrial. The trial court implicitly determined that the prosecutors provided a reasonable explanation for their actions when it declined to order that retrial is jeopardy barred, a ruling that was not an abuse of discretion in light of the record evidence showing that the prosecutors had "good faith" reasons for their actions. Did the trial court abuse its discretion in finding that the prosecution did not intentionally provoke Appellant into requesting a mistrial?

*Standard of Review*

An applicant for habeas corpus relief must prove the claims by a preponderance of the evidence. *See State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013); *Ex parte Chandler*, 182 S.W.3d 350, 353 n. 2 (Tex. Crim. App. 2005). In reviewing the trial court's ruling on a writ of habeas corpus application alleging double jeopardy, the reviewing court should consider the facts in the light most favorable to the trial court's ruling and uphold such ruling absent an abuse of

11

discretion. *See Ex parte Masonheimer*, 220 S.W.3d 494, 507 (Tex. Crim. App. 2007); *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006).

The reviewing court should defer to the trial court's implied factual findings that are supported by the record. *Ex parte Wheeler*, 203 S.W.3d at 325-26. Almost total deference should be given to the trial judge's determination of historical facts that are supported by the record, particularly to those fact findings that are based on the judge's evaluation of credibility and demeanor. If the resolution of the ultimate questions turns on an application of legal standards and does not depend upon credibility and demeanor, the determination is reviewed *de novo*. *See Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007); *Hill v. State*, 79 S.W.3d 682, 686 (Tex. App.—Amarillo 2002, pet. ref'd).

*Discussion*

The Fifth Amendment of the U.S. Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V.[3] The Double Jeopardy Clause protects a criminal defendant from repeated prosecutions for the same offense. *Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982). As a part of the protection

---

[3] Similarly, the Texas constitutional double jeopardy provision states that "[n]o person, for the same offense, shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction." TEX. CONST. Art. 1, § 14.

against double jeopardy, "the Double Jeopardy Clause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.'" *Kennedy*, 456 U.S. at 671-72, 102 S.Ct. at 2087.

When a mistrial is declared at the behest of the defendant, the "manifest necessity" standard has no place in the application of the Double Jeopardy Clause. *Id.* at 672, 102 S.Ct. at 2088. But, there is a "narrow exception" to the rule that the Double Jeopardy Clause is no bar to retrial in the case of a defense-initiated mistrial, *i.e.*, when the prosecutor engaged in conduct *intended* to "goad" the defendant into moving for a mistrial and thereby subvert the protections afforded by the Double Jeopardy Clause. *Id.* at 673, 676, 102 S.Ct. at 2088, 2089. The circumstances under which a defendant may invoke "the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Id.* at 679, 102 S.Ct. at 2090. In examining the intent of the prosecutor, the existence or nonexistence of intent can be inferred from "objective facts and circumstances." *Id.* at 675, 102 S.Ct. at 2089.

In *Ex parte Lewis*, the Court of Criminal Appeals adopted the standard announced in *Oregon v. Kennedy*, *supra*, for determining when to grant double jeopardy relief after a defense-requested mistrial. *Ex parte Lewis*, 219 S.W.3d 335, 336, 371 (Tex. Crim. App. 2007). A retrial following a defense-requested mistrial

is barred by double jeopardy *only* when it is shown that the prosecutor engaged in conduct that was intended to provoke (or goad) the defendant into moving for a mistrial or that the prosecutor acted with the intent to avoid the possibility of an acquittal. *See Ex parte Lewis*, 219 S.W.3d at 336*; Ex parte Masonheimer*, 220 S.W.3d at 506-07.

In *Ex parte Lewis*, the Court of Criminal Appeals noted that "[t]he question, for double jeopardy purposes, is not whether the defendant's trial was 'fair' but whether requesting a mistrial was ultimately his decision." *Id.* at 358. The court then noted that recklessness on the prosecutor's part does not make a defendant's decision to seek a mistrial not his own:

> The *Bauder* Court suggested that a defendant's decision in a 'recklessness' situation would not be a 'free' decision, but the question is not whether the decision was 'free' in the sense of being unconstrained but whether the decision was his *own*, albeit in the face of a dilemma. To say that the decision was not the defendant's own is to say that the decision was in reality made by someone else, e.g. the prosecutor. But when a prosecutor is merely reckless, one cannot say the prosecutor has made the decision to seek a mistrial. Only when the prosecutor intends to provoke the defendant's mistrial motion can it be said that the prosecutor, rather than the defendant, has exercised primary control over the decision to seek the trial termination.

*Id.* at 358-59. Whether the prosecutor intends to bring about a mistrial "is critical to determining whether he, rather than the defendant, has exercised primary control over whether a mistrial is sought." *Id.* at 359. Trial courts are in the best position

14

to determine whether a prosecutor's conduct evinces an intent to cause a mistrial. *Id.* at 362.

The *Ex parte Lewis* court noted that "obtaining relief under the *Oregon v. Kennedy* standard is rare.  That is understandable, however, when one considers that prosecutors do not ordinarily attempt to 'throw' their cases, even when problems are encountered.  Moreover, the double jeopardy sanction renders such conduct self-defeating." *Ex parte Lewis* at 362.  The court also noted that

> one should expect that such an extreme remedy—what is essentially an acquittal, 'the greatest form of relief in the criminal system'— invoked under the most inhospitable of circumstances—a request for relief as a result of an action the requesting party procured, which would ordinarily give rise to estoppel—would be difficult to obtain and would seldom be granted.

*Id.* (*internal footnotes omitted*).

*After viewing the trial court's implied findings regarding the prosecutors' intent in the light most favorable to the trial court's ruling, did the trial court abuse its discretion in denying the application for writ of habeas corpus?*

Appellant does not suggest that the State was attempting to avoid an acquittal, but rather was attempting to "goad" Appellant into moving for a mistrial to avoid an unfavorable outcome (*i.e.*, an inability to enhance the conviction under Section 12.43 of the Texas Penal Code).  That argument does not fit within the *Ex parte Masonheimer* standard since that standard deals with the "intent to avoid the

possibility of an acquittal."[4]  As such, Appellant's argument falls squarely into the *Kennedy* and *Ex parte Lewis* line of cases.   Therefore, retrial following the defense-initiated mistrial is only barred "when it was shown that the prosecutor engaged in conduct that was 'intended to provoke the defendant into moving for a mistrial.'"  *Ex parte Lewis* at 336 (*citing Kennedy* at 679, 102 S.Ct. at 2091).

In her dissenting opinion in *Ex parte Masonheimer,* Presiding Judge Keller provided some guidance as to what conduct by a prosecutor could show specific intent to force a mistrial.  Specifically, her dissenting opinion quoted a Maryland Court of Appeals case for the following discussion of the *Kennedy* standard:

> Ordinarily, when the prosecutor injects error into the trial, grievous as that may be, the sanction is mistrial or reversal.  It is only where the prosecutor deliberately subverts the right of the defendant to stay with the original tribunal that the double jeopardy bar becomes the appropriate relief.  In distinguishing not between grave error and lesser error and not between intended error and unintended error, but rather between deliberate error designed to accomplish Purpose A and deliberate error designed to accomplish Purpose B, the Supreme Court was emphatic.

*Id.* at 511 (*citing West v. State,* 52 Md. App. 624, 632-33, 451 A.2d 1228, 1234 (1982)).  Presiding Judge Keller also cited *West* for its distinction between an intent to obtain a conviction through improper means and intent to derail the trial:

> Even at the extreme end of the reprehensibility spectrum, however, where the prosecutor has committed *the deliberate foul*, there is still this pivotal distinction between (1) seeking to win the game unfairly

---

[4] *Ex parte Masonheimer*, 220 S.W.3d at 507.

and (2), knowing the game is going awry, deliberately causing it to be cancelled and rescheduled. *If the prosecutor wins the game unfairly, we make him replay it. When the prosecutor deliberately causes the game to be cancelled unfairly, we do not permit him to reschedule it.* This distinction is what the Supreme Court sought to communicate, as it concluded its discussion in *Oregon v. Kennedy*.

*Id.* at 511-12 (*citing West,* 52 Md. App. at 637, 451 A.2d at 1236) (*emphasis taken from opinion*).

Using the standard enunciated in *Oregon v. Kennedy* and *Ex parte Lewis*, each separate instance of alleged misconduct should be considered to see if the State's conduct was intended to provoke Appellant into moving for a mistrial.

*1) First Instance: Testimony by Apartment Manager*

Following the evidentiary hearing just prior to opening statements by the parties, the trial court ruled that the "attempting to lure small children into the apartment" statement was inadmissible at that point. The court ruled that the State could present testimony that complaints were made, and that was the basis for Appellant being excluded from the property. (RR vol. 4, p. 20).

During Blanda's testimony, the following exchange occurred between the prosecutor and Blanda that forms part of the basis for Appellant's claims on appeal:

Q. [By the prosecutor] How did you initially become familiar with Mr. Constancio?

A. Well - -

Q. Without getting into too much detail.

A. Okay. *Basically two little girls - - oh, not too much detail*.

Q. It's all right.

A. Sorry.

Q. Had you had any complaints?

A. I had complaints, yes.

Q. About?

A. *About Mr. Constancio trying to - -*

Q. Okay.

A. *- - lure - -*

MR. GUNTER: Your Honor, we ask the jury be excused.

(RR vol. 4, pp. 29-30) (*emphasis added*).

After the jury was excused, the trial court acknowledged that the prosecutors had not had time to talk to Blanda about the court's ruling regarding the complaints against Appellant that led to the criminal trespass warning. The court informed Blanda that the court's ruling was that he could talk about there being complaints made, but not the specific nature of the complaints. Blanda apologized to the court. (RR vol. 4, pp. 30-31). Appellant asked for a curative instruction to the jury—which was given. The trial court denied the motion for mistrial. (RR vol. 4, pp. 31-32). Before the jury was brought back in, Blanda was admonished by the

18

court to "listen to the question and answer the question they ask." (RR vol. 4, p. 32).

During the hearing on the defense motion for mistrial, Appellant argued that the second motion in limine had been violated when one of the first things the jury heard from Blanda was "two little girls," and that there were complaints of "trying to lure." (RR vol. 5, p. 5). The State argued that there was no intent to elicit that type of information. (RR vol. 5, p. 9).

During the hearing on the application for writ of habeas corpus, further information was given about the admission of the first statement. Appellant argued that after Blanda said that he had "had complaints, yes," the prosecutor "then took it a step further and asked 'about,' that question specifically prohibited by this Court and the answer was certainly prohibited by this Court, and again, goes to one of the most prejudicial pieces of information that could have come in before this jury." (RR vol. 6, p. 7). The prosecutor explained what occurred with the first statement:

> First of those is error number one regarding statements that apartment manager Jim Blanda made while he was on the stand. And we did point out that he had not been sufficiently admonished.
>
> That motion in limine number two was filed right before he took the stand. And the Judge ruled on that motion right before he took the stand. And we did not take a break and talk to him about what he could and could not say.

Now, she did - - Ms. Johnson did point to a couple pieces of the record where I asked, first question, "how did you become familiar with the defendant?" He proceeded to go into talk[ing] about some things that I didn't want him to talk about. He used the word Lord, and I stopped him. I said, okay, I don't want you get into too much detail. And then I said, "did you receive complaints, complaints about," and he proceeded to go into the substantive nature of those complaints. What I was looking for him to say was the defendant's name.

(RR vol. 6, pp. 13-14). She then noted that she approached Appellant's counsel during trial and told her that she was only wanting Blanda to say Appellant's name; she was not attempting to violate the motion in limine. (RR vol. 6, p. 14).

Appellant argues that the prosecutor elicited prohibited evidence during the direct examination testimony of the apartment manager, in violation of the motion in limine. There are several similar cases that discuss defense-initiated mistrials due to violations of a motion in limine.

A similar case, *Bowen v. State*, dealt with a violation of a motion in limine concerning extraneous offenses. *See Bowen v. State*, 131 S.W.3d 505 (Tex. App.—Eastland 2004, pet. ref'd) (a pre-*Lewis* case). In *Bowen*, a police officer witness gave a response to a prosecutor's question that violated a motion in limine concerning extraneous offenses. After the trial court granted the defense-requested motion for mistrial, the appellant filed an application for writ of habeas corpus alleging that retrial was jeopardy barred—which was denied. On appeal, the appellant argued that retrial was barred by double jeopardy because of

prosecutorial misconduct during the first trial. *Bowen*, 131 S.W.3d at 507-10. The appellant argued that retrial was barred because the prosecutor was aware that the officer would reference the extraneous offense since it followed the chronology of events in his report and because the prosecutor failed to admonish the State's witnesses about the appellant's motion in limine concerning extraneous offenses. The *Bowen* court found that "culpable intent on the prosecutor cannot be inferred from the fact that [the officer] was testifying about events chronologically and that the events had been written down in his report chronologically." *Id.* at 509. Additionally, the court noted that "[f]ailure of the prosecutor to admonish the State's witnesses as to the requirements of a motion in limine does not mean that the prosecutor deliberately or recklessly caused the mistrial. Negligent conduct or sloppiness on the part of the prosecutor will not trigger double jeopardy protection." *Id.* Later in the court's opinion, the court stated that "[a]t most, the prosecutor was negligent in failing to remind [the officer] of appellant's motion in limine concerning extraneous acts." *Id.* at 510.

Another similar case, *Ex parte Cruz*, came out of the Fourth Court of Appeals. *See Ex parte Cruz*, 350 S.W.3d 166 (Tex. App.—San Antonio 2011, no pet.). In *Ex parte Cruz*, a police officer testified, while being questioned by the prosecutor on direct-examination, about currency given to the police department by the defendant's attorney in violation of a motion in limine (even after the

prosecutor had instructed the officer not to refer to the money given to defense counsel). After the defense-requested motion for mistrial was granted, the appellant filed an application for writ of habeas corpus arguing that retrial was jeopardy-barred. During the hearing on the application, the trial court determined that the officer had made an honest mistake and that the prosecutor did not have any intent to solicit testimony in violation of the motion in limine and denied the application. *Ex parte Cruz*, 350 S.W.3d at 167-69. On appeal, the appellant argued that retrial was barred on jeopardy grounds because the prosecutor "set the stage for the officer to identify the money in Exhibits 20 and 21 as the money given to defense counsel" and that the State's use of the word "okay" during the questioning was "tantamount to encouraging the witness to violate the limine order. The *Cruz* court disagreed, determining that the record supported a finding that the officer's unsolicited statement was not attributable to the State's action or inaction and that the record showed no intentional prosecutorial misconduct either to provoke the appellant to move for a mistrial or to avoid the appellant's acquittal. *Id.* at 169.

Based on a reading of the trial record here, it is obvious that the first objectionable statement was not elicited because of any intentional act of misconduct by the prosecutor. Before Blanda started noting how he knew Appellant, the prosecutor expressly stated the following: "[w]ithout getting into too

much detail."[5]   After Blanda said, "[b]asically two little girls," he immediately corrected himself and acknowledged the admonishment not to go into too much detail.[6] The prosecutor stated "[i]t's all right," then asked Blanda if he had had any complaints.   He said he had had complaints—but did not say whom those complaints were about.   The prosecutor then asked "About?"; Blanda replied "[a]bout Mr. Constancio trying to" and "lure."[7]   In between the "[a]bout Mr. Constancio trying to" and "lure" statements, the prosecutor said "[o]kay."[8]

When the prosecutor thought that Blanda was about to get into some things she did not want him to talk about, she cut him off and said, "Without getting into too much detail."[9]   When he started discussing the substantive nature of the complaints a few answers later, the State's attorney tried to cut him off by saying "[o]kay."   Appellant asserts that the "[o]kay" statement was meant to encourage the prohibited testimony.[10]   However, this is not supported by the record—or by a commonsense understanding of how people communicate with one another.   The "okay" statement, which appears midsentence in the witness's "[a]bout Mr. Constancio trying to lure" testimony, is indicative of the prosecutor trying to cut

---

[5] (RR vol. 4, p. 29).
[6] *Id.*
[7] (RR vol. 4, pp. 29-30).
[8] (RR vol. 4, p. 30).
[9] (RR vol. 4, p. 29; vol. 6, p. 13).
[10] (Appellant's Br. at 18).

23

Blanda off before he said anything further.[11]  At the very least, assuming that the prosecutor's intent to cut Blanda off with the "okay" statement before he said anything further is not clear from the record, that is because the Court only has the benefit of a cold record.  Since there is nothing definitive in the cold record showing that the statement was intended as a cutoff as opposed to an encouragement, the Court should give deference to the trial court's implied ruling that the prosecutor's actions were done in good faith.  And, because it is reasonable that the State could have believed that the response to its question "About?" would be answered with Appellant's name and that the State did not intend to elicit inadmissible evidence,[12] the trial court's ruling should stand.[13]

Appellant also challenges the prosecutor's statement that they had not had time to admonish the witness about Appellant's second motion in limine. Appellant argues that there was an hour-and-a-half recess and that four hours

---

[11] *See Ex parte Cruz* at 169 (concluding that the record supported a finding that the officer's statement given in violation of the motion in limine was not attributable to the State's action or inaction, even when the prosecutor said the word "[o]kay" right when the impermissible subject was being broached).

[12] (RR vol. 5, p. 9; vol. 6, p. 14).

[13] The trial judge obviously believed that Blanda had volunteered unsolicited information.  After advising him about the scope of the allowable testimony about the "complaints," the judge admonished him to "[j]ust listen to the question and answer the question they ask."  (RR vol. 4, pp. 30-32).  Thus, Appellant's argument that the response was a direct response to a specific question (Appellant's Br. at 18) is not supported by the record.  And, in any event, considering that the prosecutor "'didn't expect to elicit' the answer, was 'surprised' by the answer, and 'had no idea' the officer would give the answer," *see Ex parte Bauder*, 2 S.W.3d 376, 378 (Tex. App.—San Antonio 1999, pet. ref'd), it cannot be said that the prosecutor's conduct was intended to provoke the defense into requesting a mistrial.

24

elapsed from the time the second motion in limine was granted until the guilt-innocence phase of trial began.[14] However, the argument that the prosecutor had "ample time" to contact Blanda is not supported by the record. The trial court, when admonishing Blanda about not going into the nature of the complaints, said "I'm not sure if y'all have had a chance to talk really. *Probably not.*"[15] The trial judge, after telling Blanda the scope of the court's ruling, stating the following to Blanda after he apologized to the court: "That's okay. *I don't think they got a chance to tell you that*, so I want to make sure - - we're not talking about the nature of the complaints."[16] Obviously, the trial court felt that there had not been enough time to admonish Blanda about the second motion in limine—which makes sense given that during that "four hour[]" period alluded to by Appellant, a voir dire examination of the venire took place, the fire alarm went off (which presumably led to evacuation of the courthouse[17]), a hearing was held outside the jury's presence with Officer Overholser, and then the trial started with opening statements of the parties and Blanda being called to the stand. And, there was no

---

[14] (Appellant's Br. at 17).

[15] (RR vol. 4, p. 30) (*emphasis added*).

[16] *Id.* (*emphasis added*).

[17] (RR vol. 3, p. 102). The fire alarm went off while the questioning of individual veniremembers was going on at the bench, thereby causing an hour-and-a-half break in time in the individual questioning. *Id.* After individual questioning resumed, the trial judge noted that "everybody ran out for the fire alarm." (RR vol. 3, p. 106). An evacuation of the courthouse—and the consequent disarray surrounding that—is hardly the best time to "contact the two witnesses." (Appellant's Br. at 17).

recess between the time that the trial court held the statements to be inadmissible and the beginning of trial.[18] Furthermore, there is no proof that Blanda was even in the courtroom or the general vicinity of the courthouse at such a time that he could be admonished about the scope of the second motion in limine. Thus, the trial court's determination that the prosecutors had not had adequate time to admonish Blanda about the second motion in limine should be given deference.[19]

### 2) Second Instance: Testimony Regarding Admitted Lease Violation

Following the evidentiary hearing just prior to opening statements by the parties, the trial court ruled that the "dangerous to other residents" statement was inadmissible at that point. The court ruled that the State could present testimony that complaints were made, and that was the basis for Appellant being excluded from the property. (RR vol. 4, p. 20).

After the jury was instructed to disregard "the last couple of statements by the witness," Blanda was asked whether Ledesma became aware that Appellant was not allowed on the premises—to which he replied yes. (RR vol. 4 p. 32). The State then asked Blanda about the lease violation given to Estella Ledesma. (RR

---

[18] (RR vol. 4, pp. 20-21).
[19] Even *if* there had been sufficient time for the prosecutors to admonish Blanda, however, that does not show that the prosecutors intended to provoke Appellant into moving for a mistrial. The *Bowen* court noted that "[f]ailure of the prosecutor to admonish the State's witnesses as to the requirements of a motion in limine does not mean that the prosecutor deliberately or recklessly caused the mistrial. Negligent conduct or sloppiness on the part of the prosecutor will not trigger double jeopardy protection." *Bowen* at 509.

vol. 4, pp. 33, 35). When the State sought to admit the *Notice of Lease Violation* as State's Exhibit 6, defense counsel conducted a brief voir dire examination of Blanda and then objected on improper predicate grounds. The trial court overruled the objection and allowed State's Exhibit 6 to be admitted. (RR vol. 4, pp. 33-35).

After the State admitted State's Exhibit 6, the prosecutor asked the following questions regarding it:

Q. Mr. Blanda, can you tell the jury what that document is that I'm showing to you?

A. This is a lease violation. If there is a violation of the contract for whomever is on the lease at the apartment, whoever is in the office - - I obviously can't be there all the time, but they fill out the appropriate documents here so we have it for our records should we need to evict or what have you.

Q. What's the purpose of a lease violation?

A. The purpose is for the tenant to address that issue immediately.

Q. And who is the tenant that was on the lease at this time?

A. Estella Ledesma.

Q. And what does it say that the violation was?

A. *Unauthorized drunk man and dangerous to other residents*.

MS. JOHNSON: Objection, your Honor. May we approach?

(RR vol. 4, pp. 35-36).

After approaching the bench, Appellant argued that the last statement violated the second motion in limine. The prosecutor argued that the exhibit had been offered as a piece of evidence and admitted by the court. (RR vol. 4, p. 36). Appellant argued that the exhibit was not tendered to the court prior to it being admitted into evidence, so the court did not have the opportunity to look at it. *Id.* The trial court decided that State's Exhibit 6 was admissible, but that (after further discussion later in the record) the "dangerous to other residents" portion should be redacted by whiting out that portion of the document. (RR vol. 4, pp. 36, 54-55). Appellant's counsel then renewed the request for a mistrial. The trial court overruled Appellant's motion, but instructed the jury to disregard Blanda's last statement. (RR vol. 4, pp. 36-37).

Appellant argued during the hearing on the motion for mistrial that Blanda gave the second inadmissible statement just "10 or 15 minutes" after giving the first inadmissible statement, in violation of the second motion in limine. (RR vol. 5, p. 5). The prosecutor argued that there was no objection to the substance of State's Exhibit 6 (other than an improper predicate objection that did not address the substance of the document), and therefore it was admitted in its entirety. He argued that it was not until Blanda was being questioned about the explanation of the lease violation that the defense objected to the particular statement in the *Notice of Lease Violation*. (RR vol. 5, pp. 9-10). When asked by defense counsel

if it was the State's intent to get in a document that the prosecutors knew was a violation of the second motion in limine, the State's attorney said "Absolutely not. It was not. However, we offered that document to the Defense. They objected to improper predicate. Ms. Johnson took that witness on voir dire, was allowed to ask questions, and then no other objections were made." (RR vol. 5, p. 10). The prosecutor also argued that the defense had the opportunity to address any issues with the lease violation document and bring it to the court's attention, but did not do so. (RR vol. 5, p. 11).

During the hearing on the application for writ of habeas corpus, the following was stated by defense counsel about the second statement:

> The second statement in my motion in limine came from State's Exhibit 6, from that lease violation. The [S]tate knew that that statement was in there, *as did the defense*. And the [S]tate failed to tender that document to the Court. After that document was admitted, the [S]tate again asked "and what does it say that violation was?" That question again goes specifically into the information clearly prohibited by the prior Court's order in this case.

(RR vol. 6, p. 8) (*emphasis added*). The prosecutor responded as follows:

> Error number two, this is a piece of evidence that was a lease violation. This piece of evidence had been in the possession of both the defendant and the [S]tate for several months prior to the trial. When I offered this piece of evidence, it was objected to but only as to its predicate. And as defense just admitted, defense knew what was in there. She just said she knew what was in there at that time. She didn't object to the substantive nature of that piece of evidence.

*The purpose of tendering the piece of evidence to the defense is for them to see if that proposed evidence is objectionable or not.* They pointed out in their brief that we didn't show it to the Court. I think they just mentioned that we didn't show it to the Court. There's nothing in the Rules of Evidence or the Code of Criminal Procedure that requires me to do that.

So ultimately error number two, the only objection she made was to predicate; therefore, it's not - - has not - - that issue has not been preserved for appeal. It is not sufficiently specific for an appellate court to determine from the record what that objection was about if it was to the substance of that document.

(RR vol. 6, pp. 14-15) (*emphasis added*). When defense counsel later asked what the State's intent was in introducing the lease violation notice with the inadmissible language contained therein without bringing it to the court's attention, the prosecutor argued that the court had granted a motion in limine, but had not made a final determination as to the admissibility of the evidence. (RR vol. 6, pp. 21-22).

During the rebuttal argument, Appellant's counsel stated the following:

I concede that during the original trial of this offense, although I objected to State's 6, I did object on the basis of improper predicate. The Court overruled that objection and it was admitted. But the Court had made a final ruling as to the statement contained in State's 6 less than an hour before. That ruling was still valid. The State was aware of that ruling. And that ruling was clear.

It was a clear order of the Court not to go into the substance of any complaints. *I may have been mistaken in my assumption that it would be redacted before being published to the jury. I understand I may have made an error there.* But this Court also, in the heat of the moment during that original trial proceeding, saw that the [S]tate

30

didn't tender that to the Court. The Court didn't have an opportunity to review it. And the Court had ruled decisively as to that statement.

(RR vol. 6, pp. 18-19) (*emphasis added*).

A case that deals with a similar fact situation as the one at issue here is *Ex parte Wheeler, supra* (a pre-*Lewis* case). In *Ex Parte Wheeler,* the issue of fault (in a manslaughter/criminally negligent homicide trial) was hotly contested throughout the entire trial. After cross-examining the defense's expert witness for three hours, the Stated asked "Are you aware that her [the defendant's] insurance carrier found her at fault?" The judge immediately sent the jury out and later granted a mistrial following a weekend recess. Before the next trial, the defendant filed a pretrial application for writ of habeas corpus claiming a double jeopardy violation. After the trial judge extensively questioned the prosecutor and defense, the trial court denied the defendant's double jeopardy motion and pretrial writ application. *Ex parte Wheeler*, 203 S.W.3d at 319-22. The Court of Criminal Appeals agreed that the asking of the "Are you aware that her [the defendant's] insurance carrier found her at fault?" question was manifestly improper. *Id.* at 324. But, the court, noting that the prosecutor had a sincere, albeit mistaken, good faith belief for asking the question, determined that the trial judge did not abuse her discretion in refusing to find that retrial was jeopardy barred since the record evidence supported the habeas trial court's finding that the prosecutor did not

possess the culpable mental state required for a double jeopardy violation. *Id.* at

328-30. In its reasoning, the court noted that

> We cannot disagree with the trial judge's implicit conclusion that this was a question that was asked in good faith, albeit an impetuous, perhaps even stupid, question. The trial judge saw the prosecutor and could judge his credibility and integrity; she was entitled to conclude that the prosecutor acted with unwarranted zeal rather than malice or reckless disregard for the defendant's rights.

*Id.* at 330.

The record evidence here supports the trial court's implied finding that the prosecutor did not intentionally "goad" the defense into a mistrial by either admitting the un-redacted *Notice of Lease Violation* or in asking the question about the specific violation at issue. During the prosecutor's questioning of James Blanda, she admitted the *Notice* as State's Exhibit 6. When she offered it into evidence, she first tendered the exhibit to the defense. Though the defense objected to the admission of the exhibit, the defense objected only on predicate grounds, not as to the substance of the document.[20] Only after the exhibit had been admitted and Blanda read the "[u]nauthorized drunk man and dangerous to other residents" line did the defense object that the foregoing statement violated the

---

[20] (RR vol. 4, pp. 33-34).

motion in limine. After a hearing, the "and dangerous to other residents" portion of the notice was redacted from the document.[21]

In the prosecutor's attempt to prove up the notice element of the offense of criminal trespass, *i.e.*, that Appellant had notice that the entry was forbidden,[22] the State admitted evidence that contained a statement that violated the motion in limine. The prosecutor operated under the belief that because the exhibit had been admitted into evidence without objection (at least to the substance of the document), the exhibit was admissible for all purposes. Ultimately, that belief was erroneous since the "and dangerous to other residents" portion violated both the motion in limine and the trial court's order. But, that belief, albeit erroneous, does not show an intent to provoke a mistrial. The *Notice of Lease Violation* was provided to the defense "several months prior to the trial."[23] During trial, the prosecutor went through the proper steps to get the exhibit admitted into evidence, namely proving up the predicate for admissibility of the document, tendering it to the defense, and moving to admit the *Notice* as an exhibit. Had the prosecutor intended to provoke a mistrial, she would not have laid the proper foundation for admitting the document and provided it to the defense before discussing the contents thereof.

---

[21] (RR vol. 7, State's Exhibits 6, 6A).
[22] *See* TEX. PEN. CODE ANN. § 30.05(a)(1).
[23] (RR vol. 6, p. 14).

Although the prosecutor's actions may have been intentional in the sense that the prosecutor intended to elicit the statement at issue, nothing in the record suggests that the prosecutor's actions were done with the intent to force the defense to request a mistrial.[24] Indeed, far from being an intentional act of misconduct, the record shows that the error in admitting the un-redacted *Notice* slipped past not only the State, but also the defense. The prosecutors made the mistake of not realizing that the document contained a statement that was covered by the second motion in limine and the trial court's order and was not admissible in its then-current form.[25] The defense made the mistake of not objecting to the admission of

---

[24] *See Ex parte Wheeler* at 330-31 (finding that though the question about whether the defendant's accident reconstruction expert was aware that the defendant's insurer had found her at fault was manifestly improper, the trial court "was entitled to conclude that the prosecutor acted with unwarranted zeal rather than malice or [under the former recklessness standard] reckless disregard for the defendant's rights."); *Sandifer v. State*, 233 S.W.3d 1, 3-4 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (stating that the prosecutor's mistake in asking the investigating detective whether the appellant had not taken a polygraph test, though one was offered, did not constitute conduct designed to goad the defense into asking for a mistrial); *Ex parte Macias*, No. 08-12-00192-CR, 2014 WL 5393042 at *4, 2014 Tex. App. LEXIS 11622 at *10 (Tex. App.—El Paso Oct. 22, 2014, no pet.) (*not designated for publication*) (stating that a holding that retrial is jeopardy barred "where the State engaged in some kind of intentional conduct even where there is no evidence that the prosecutors acted with the requisite intent to provoke or goad the defendant into seeking a mistrial" would be contrary to the *Kennedy* standard).

[25] The prosecutor's reasonable—albeit mistaken—belief that everything in the *Notice* was admissible was shown from the argument given during the motion for mistrial hearing. During that hearing, the prosecutor argued that "[t]he Court had granted a motion in limine. The Court had not made a final determination as to the admissibility of that evidence." (RR vol. 6, p. 22). Ultimately, that statement is incorrect since there had been a finding by the trial court that the statement was inadmissible. But, that statement does show that the admission of the statement was the result of a simple misunderstanding as to the scope of the trial court's order rather than intentional misconduct on the prosecutors' part.

While Appellant criticizes the prosecutor's mistaken belief that the evidence had not been ruled inadmissible (Appellant's Br. at 22-24), that criticism is a blatant attempt at Monday-

State's Exhibit 6 (in its un-redacted form) on Rule 404(b)[26] and/or Rule 403[27] grounds.

Furthermore, defense counsel made a mistake in believing that a document that had being admitted for all purposes (without any redactions or a limiting instruction) would be redacted after it had been admitted. During the hearing on the application for writ of habeas corpus, Appellant's counsel acknowledged knowing that the offending statement was in the *Notice*.[28] She also stated that she "may have been mistaken in [her] assumption that it would be redacted before being published to the jury."[29] Her assumption that the document would be redacted before questions were asked of Blanda about the document was not reasonable since: (a) the document was being admitted in its entirety at that time; and (b) there were no redactions to the document at the time it was admitted. To believe that the document would be redacted after it had been admitted for all purposes is not a reasonable belief. The appropriate time to ask for redactions

---

morning quarterbacking. It is easy to see the exact scope of the trial court's evidentiary order when one has the Reporter's Record *right in front of them, where the words are clearly on the computer screen or on the printed page*. That, of course, is not what happened at trial, though. At trial, the prosecutors did not have the court's evidentiary order written out for them to review to their heart's content. During trial, misunderstandings can arise that may seem unreasonable in retrospect, but are—as here—entirely reasonable while trial is ongoing.

[26] TEX. R. EVID. 404(b).
[27] TEX. R. EVID. 403.
[28] (RR vol. 6, p. 8).
[29] (RR vol. 6, p. 18).

35

would be *before* trial, not during trial—and certainly not after the document with the offending statement has already been admitted into evidence.[30]

Appellant suggests that the trial prosecutor knew that the relevant statement in the *Notice of Lease Violation* was inadmissible because the prosecutor did not first tender the document to the trial court to be examined before it was admitted.[31] But, there is nothing in the Code of Criminal Procedure or Rules of Evidence that requires a document to first be provided to the trial court before it is admitted.[32] And, there is no record evidence showing that the *Notice* was not first turned over to the court as some sort of insidious attempt to admit inadmissible evidence and provoke the defense into requesting a mistrial.[33] Instead, *at worst*, the admission of the prejudicial statement was "the result of inadvertence, sloppiness, or even simple negligence,"[34] which does not render re-trial jeopardy-barred.

---

[30] The foregoing observation is noted to highlight that mistakes were made on both sides in the admission of the prohibited statement. How can there be intentional misconduct by the prosecutors from the admission of a document when the defense did not even realize—until after the fact—that the document violated the motion in limine and the trial court's order?

[31] (Appellant's Br. at 11).

[32] Had Appellant objected to the substance of the document, then it would certainly have been necessary to show State's Exhibit 6 to the court before it was admitted. But, since the only objection was on improper predicate grounds, the trial court did not need to look at the exhibit before it was admitted into evidence.

[33] Indeed, if that were the case, then all of the evidence in the case would have been improperly admitted since there is no record evidence that any of the other State's Exhibits (State's 1-5, 7-15) were first tendered to the trial court before being admitted into evidence. The exhibits were first shown to the defense at the time they were being offered into evidence, but they were not first turned over to the trial judge before they were admitted into evidence. (RR vol. 4, pp. 40, 43-44, 73-74). And yet, no argument has been advanced that the other exhibits in the case were improperly admitted since they were not first shown to the trial judge before being admitted.

[34] *Ex parte Peterson*, 117 S.W.3d at 817. As noted in a footnote, "[d]ouble jeopardy does not bar

While the statement contained within the *Notice* was ultimately not admissible, the State should not be blamed for admitting evidence that not even the defense realized—until after the fact—was inadmissible.[35] Intent to "goad" or provoke the defense into a mistrial is not shown from admitting evidence that neither party realizes *at the time the evidence is admitted* is inadmissible.

*3) Instance Three: Police Officer's Statement on Cross-Examination*

The third statement was elicited during Appellant's cross-examination of Officer Overholser. Appellant was asking questions about the arrest for the instant offense. (RR vol. 4, p. 85). The following then appears on the record:

> Q. After you arrested Raul, you told him at this point that if he returned to the property, he would be arrested for criminal trespass; is that right?
>
> A. After I arrested him?
>
> Q. Yes, sir.

retrial when the misconduct, causing a reversal or a mistrial, is committed by the inadvertent Gabriel; double jeopardy bars retrial only when caused by the intentional [or at that time reckless] misconduct by a consciously aware Beelzebub." *Id.* at 817 n. 57.

[35] Though Appellant is quick to condemn the failure of the prosecutor to realize the incriminating nature of the statement and the inadmissibility of the un-redacted *Notice*, he fails to acknowledge that the defense also failed to realize its incriminating nature—or at least failed to speak up before it had been admitted for all purposes at trial. In fact, it can be argued that defense counsel realized (after the fact) that she was rendering ineffective assistance to her client by not properly reviewing the proffered document *before* it was admitted and making appropriate objections *before* it had already been admitted for all purposes, and therefore decided to "pass the buck" by blaming the State's attorneys for her own deficiency. Of course, that does not relieve the State from having to comply with motions in limine and court orders (and the State is certainly not suggesting otherwise), but the fact that not even the defense realized the inadmissible nature of State's Exhibit 6 (at least in its un-redacted form) before it had been admitted does show the lack of intent by the prosecutors to provoke the defense into moving for a mistrial.

A. I don't -- we talked about a lot of things so he was already under arrest. I don't understand.

Q. Well, let me have you look at your --

A. I'm sorry.

Q. If you wouldn't mind going ahead and look at your report to refresh your memory.

A. *Oh, I'm sorry. Oh, I see at the end where he told me he'd beat my ass if he saw me again.*

MS. JOHNSON: Objection, your Honor. May we approach?

(RR vol. 4, pp. 85-86) (*emphasis added*).

At the bench, defense counsel argued that Officer Overholser's answer was nonresponsive to her question. (RR vol. 4, p. 86). After the jury was excused, defense counsel argued that the last statement was covered by the first motion in limine since the first motion in limine encompassed extraneous offenses and bad acts. (RR vol. 4, pp. 86-87). Defense counsel then re-urged her motion for a mistrial. When asked for a response, the prosecutor argued that it was the defense that elicited that statement rather than the State and that the witness "was simply answering the question asked by Ms. Johnson, and she got a response that she didn't particularly like." (RR vol. 4, pp. 87-88). Appellant's counsel argued that it was incumbent upon the State to advise their witnesses of motions in limine and information that would be covered by the motion in limine. The prosecutor noted

38

that he had had a conversation with Overholser prior to his testimony. (RR vol. 4, p. 89).

The trial court, after looking at the report, acknowledged that the statement was at the very end of the report. (RR vol. 4, p. 90). Defense counsel argued that the defense wanted Overholser to refresh his memory about whether he told Appellant if he ever came back again, he would be arrested for criminal trespass. *Id.* The trial court then overruled the motion for mistrial and instructed the jury to disregard the last answer given by the witness. (RR vol. 4, pp. 90-91).

During the hearing on the motion for mistrial, Appellant argued that Overholser violated the first motion in limine when he "blurt[ed] out, oh, right after he threatened to beat my ass." (RR vol. 5, p. 5). Defense counsel then argued that "Officer Overholser is a seasoned veteran of the Lubbock Police Department by his own admission," that he has been instructed "numerous times about motions in limine and extraneous offenses," and that "[t]he actions that he took yesterday and the reaction that was created within that jury was calculated. He did that on purpose. There is no question." (RR vol. 5, p. 7). The prosecutor objected to that last argument, saying that there is no evidence to support that argument. Appellant's attorney argued that "there is plenty of evidence, just by looking at the question that was asked that was posed to him and the response. There can be no other logical conclusion to be drawn." (RR vol. 5, pp. 7-8).

The prosecutor then addressed why a mistrial should not be granted. With regards to Overholser's response, the prosecutor argued that the response—perhaps a nonresponsive response—was based on a question asked during cross-examination, not a question elicited by the State. He argued that the defense asked a bad question and got a response they did not like. (RR vol. 5, p. 12). The defense replied that the prosecutors were supposed to meet with their witnesses ahead of time and instruct them as to the evidence they are not to go into from the witness stand—from either side. (RR vol. 5, p. 14). The court noted that the "Defense counsel requested the officer to look at the - - towards the bottom of his report. Based on the probable cause that's set out in the Court's file, that statement is in the last paragraph of that report[.]" (RR vol. 5, p. 16).

During the hearing on the application for writ of habeas corpus, defense counsel argued that the impermissible statement from Overholser occurred due to the State's "failure" to admonish its witnesses concerning the "boundaries on testimony that were set by this Court." (RR vol. 6, pp. 8-9). She also argued that Overholser "took the opportunity to blurt that information out in front of the jury when no question had been asked of him, when he simply had been instructed to review his police report. The question before that could not have been a more closed-ended question and it went to an essential element of this offense which is the notice that was given to Mr. Constancio. The officer became aware that his

report was going to be used against him and the officer acted out." (RR vol. 6, pp.

9-10). The prosecutor stated the following about the third statement:

> Defense motion in limine specifically directs the prosecutor not to, quote, elicit a certain response from a witness. Your Honor, I'm not sure how I could have elicited anything from the witness when he was on cross examination. Maybe his answer was nonresponsive. I'm not conceding that it was.
>
> But if the Court finds that his answer was nonresponsive, to find that the [S]tate acted intentionally getting him to act that way would require a finding of some kind of collusion or witness coaching, of which there is no evidence, because it didn't happen. And he did on the record state that he had been admonished by the Court about that motion in limine before he took the stand.

(RR vol. 6, pp. 15-16).

The case before the Court is somewhat similar to *Ex parte Washington*, a case out of the Second Court of Appeals. *See Ex Parte Washington*, 168 S.W.3d 227 (Tex. App.—Fort Worth 2005, no pet.). In *Ex Parte Washington*, two testifying officers made three improper references to possible extraneous offenses committed by the appellant in violation of a motion in limine. After a mistrial was granted, the appellant argued that re-trial was jeopardy-barred. During the writ hearing, the two prosecutors in the case and one of the police officers testified about their conversations with the police officers. During their testimony, it was revealed that the first officer was not warned not to mention any extraneous offense or any sort of misconduct until after the first violation of the motion in

41

limine had already occurred, and that the third violation of the motion in limine occurred because the officer did not believe he was mentioning an extraneous or bad act on the appellant's part. Following their testimony, the trial court denied relief. *Ex parte Washington*, 168 S.W.3d at 230-33. The appellate court first determined that a witness's state of mind is not imputed to the prosecution so as to constitute prosecutorial misconduct which would preclude retrial. *Id.* at 237-38. The court then agreed with the habeas court's findings that the first two violations of the motion in limine were inadvertent, but that the third violation was not inadvertent. *Id.* at 238-39. But, the court held that the appellant did not meet his burden of establishing that "any manifestly improper prosecutorial misconduct provoked the request for mistrial" or that the prosecutor engaged in the conduct with the intent to goad the appellant into requesting a mistrial. *Id.* at 239.

The third and final statement Appellant takes issue with occurred *while defense counsel was cross-examining the witness*. During the cross-examination, defense counsel asked Overholser if he told Appellant after he arrested him that if he returned to the property, he would be arrested for criminal trespass. After further discussion, defense counsel asked him to look at his police report to refresh his memory. While presumably looking at his report, Overholser stated, "Oh, I'm

sorry. Oh, I see at the end where he told me he'd beat my ass if he saw me again."[36]

Appellant seeks to impute ill motive or intent on Overholser's part in making that last statement.[37] But, that statement, though a violation of the motion in limine, seems to be due to an honest mistake on Overholser's part. Overholser was obviously confused by defense counsel's question, as shown from the following three statements (all of which were given immediately after the question about whether he told Appellant he would be arrested for criminal trespass if he returned to the property): "*After I arrested him?*"; "I don't - - we talked about a lot of things so he was already under arrest. *I don't understand.*"; and "*I'm sorry.*"[38] After he was directed to look at his police report to refresh his recollection, he responded *with a statement that was taken from his report*.[39] Far from having an improper motive to get in inadmissible evidence, the objective facts show that Overholser was answering what he believed to be the question asked of defense counsel.

---

[36] (RR vol. 4, pp. 85-86).
[37] (Appellant's Br. at 24).
[38] (RR vol. 4, p. 85) (*emphasis added*).
[39] The trial judge even noted that the statement at issue was in the police report. (RR vol. 4, p. 90). The Clerk's Record backs up that observation since the police report shows that statement in the second to last line of the main portion of the report. (CR p. 9). Thus, though Appellant suggests that Overholser failed to look at his report before making the statement (Appellant's Br. at 24), the statement is taken directly from his report.

This is essentially an instance of "ask a bad question, get a bad answer." Appellant asked a question and when Officer Overholser was obviously confused about the question and even said, "I don't understand," Appellant had him refer to his report. Instead of seeking to clarify what she was looking for before she asked the officer to look at his report, she asked him to look at his report without making any attempt to refer to the particular portion of the report she wanted him to look at (*e.g.*, such as asking him to look at the last line of the report). While the answer does appear non-responsive to the question, it is possible that, due to his confusion—which was exacerbated by trial counsel's inartful questioning and failure to point out the specific portion of the report to which she was referring—Overholser thought that defense counsel was asking about *statements that Appellant said to him* rather than *statements that he said to Appellant*.[40]

The inadvertent nature of the violation of the motion in limine is also shown from an earlier portion of the cross-examination. Earlier during the cross-examination, defense counsel was questioning Overholser about Blanda's

---

[40] The lack of a definitive statement in the record as to why Overholser responded the way he did is solely due to defense counsel's refusal to let him speak during the hearing outside the jury's presence. During the hearing that occurred outside the jury's presence after the "beat my ass" statement was given, Overholser tried to clarify why he gave that statement (after defense counsel argued that the response "was in no way reflective or responsive to the question requested"), but defense counsel stated "I would ask that the witness sit silent please." (RR vol. 4, p. 88). In essence, defense counsel told Overholser to "shut up" and that he did not care what Overholser had to say—thereby preventing this Court from having the benefit of what Overholser was thinking at the time he gave the statement.

confronting of Ledesma about Appellant. When he asked about which instance defense counsel was talking about, she referred him to his report, saying that the report says "that Mr. Blanda spoke with Raul's mother, is that right?" Overholser replied, "I'm not finding it, but I'm not disputing it. I remember that happening, yes."[41] When defense attorney asked to approach, Overholser (who was seemingly reviewing his report at the time) stated, "I've got it. I've got it. Sorry. Yes, ma'am. I've got it. Slow reader."[42] As that portion of the trial record suggests, Overholser simply made an honest mistake when he was reading the incorrect portion of the report in response to the later question.

Appellant asserts that the improper statement occurred due to the State's alleged failure to admonish its witness.[43] However, this is not supported by the record. After the statement was made during trial, the prosecutor expressly stated that he had had a conversation with Officer Overholser prior to his testimony.[44] At the writ hearing, the prosecutor also stated that Officer Overholser "did on the record state that he had been admonished by the Court about that motion in limine before he took the stand."[45] Although the particular admonishment is not found in

---

[41] (RR vol. 4, pp. 80-81).
[42] (RR vol. 4, p. 81).
[43] (Appellant's Br. at 24-25).
[44] (RR vol. 4, p. 89).
[45] (RR vol. 4, pp. 15-16).

the record, the Court can infer from this statement that Overholser was admonished about the motion in limine and its scope prior to his testimony.

Assuming, *arguendo*, that the State did not admonish Officer Overholser (or did not properly or fully admonish him), the failure to properly admonish him, while possibly constituting a violation of the trial court's order or the motion in limine, does not equate to intentional misconduct for *Kennedy* or *Ex parte Lewis* purposes. As Appellant points out in his brief,[46] Officer Overholser was a veteran police officer with almost ten years experience at the time of trial.[47] As such, he was likely aware that extraneous offenses are not admissible—thereby further showing that the "beat my ass" statement was inadvertent and done in response to defense counsel's inartful questioning.[48] And, even *if* he did intentionally make the statement, however, it cannot be imputed to the prosecutors unless there is also a finding of collusion—of which there is no evidence of such because it did not occur.[49] Instead, as noted in Judge Meyer's concurring opinion in *Ex parte*

---

[46] (Appellant's Br. at 12, 24).

[47] (RR vol. 4, pp. 8, 64).

[48] Overholser's knowledge of the motion in limine and his careful attempts to avoid getting into inadmissible extraneous offense or bad act evidence was shown during the direct examination. During the direct examination, the prosecutor questioned him about whether he knew Appellant and how he became familiar with him. After asking how he became familiar with him, she quickly followed that question up with "Without getting too specific into anything." He expressed understanding and stated that he became aware of Appellant because "[h]e was staying at the apartment complex with his mother and his mother's unit." (RR vol. 4, pp. 67-68). A little later in his testimony, he showed his understanding of the limitation on testimony by referencing "complaints" without any elaboration about the nature of the complaints. (RR vol. 4, pp. 68-69).

[49] As noted in *Ex parte Washington*, "we decline to hold that the knowledge of a State's witness

*Masonheimer*, the inadmissible statement at issue that led to the third motion for mistrial was accidental, in that the "State's witness blurt[ed] out unelicited, inadmissible testimony.[50] Accidental violations of the motions in limine do not constitute intentional misconduct on the prosecutor's part designed to provoke the defense into moving for a mistrial.

*Conclusion*

Appellant argues that the prosecution intentionally provoked him into requesting a mistrial to benefit the State in a retrial, and that further prosecution is consequently barred by Double Jeopardy. Where a mistrial is declared at the request of the defendant, retrial is barred by double jeopardy only in circumstances where the government conduct was intended to provoke or "goad" the defendant into requesting a mistrial. The relevant inquiry is whether the prosecutor *intended* to provoke the defendant's mistrial motion. *See Ex parte Lewis* at 358-59.

In examining the intent of the prosecutors, the *Kennedy* court stated that the existence or nonexistence of intent can be inferred from "objective facts and

---

may be imputed to the prosecution so as to constitute prosecutorial misconduct which would preclude retrial of a defendant under the Fifth Amendment to the United States Constitution or Article I, section 14 of the Texas Constitution when a claim of double jeopardy is raised following the trial court granting a mistrial." *Ex parte Washington* at 238; *see also Washington v. State*, 326 S.W.3d 701, 706-07 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (stating that a witnesses outburst in front of the jury was not attributable to the prosecutors "action or inaction," and that the record did not show intentional prosecutorial misconduct designed to provoke the appellant into moving for a mistrial or to avoid the possibility of an acquittal).
[50] *Ex parte Masonheimer* at 509-10 (Meyers, J., concurring).

circumstances." *Kennedy* at 675, 102 S.Ct. at 2089. The "objective facts and circumstances" here show that the prosecutors' actions were the result of inadvertence or mistake—not due to intentional misconduct. The first statement was due to an ambiguous question by the State that inadvertently elicited an unexpected and unanticipated response. The second statement was elicited under the mistaken (but reasonable) belief that, because the document had been admitted for all purposes without any defense objection, the entire document (including the contents thereof) was admissible. The last statement was given in response to an inartful question asked by the defense that led to confusion on the part of the witness as to what defense counsel wanted him to answer.

The trial court, of course, heard the explanation from the two prosecutors—at various stages of the proceedings—and implicitly accepted their good faith reasons regarding each of the three instances discussed in this brief. Because the trial judge has determined that a retrial is not jeopardy-barred, the evidence is to be viewed "in the light most favorable to the trial court's ruling." *Ex parte Masonheimer* at 506. And, in conducting the review on appeal, "almost total deference" should be given to the trial court's determinations of historical fact that are supported in the record—which the trial court's implied determinations of historical fact are so supported—and fact determinations involving an evaluation of credibility or demeanor. *See Hill*, 79 S.W.3d at 686. One of the fact

determinations would be the prosecutor's "state of mind." *See Ex parte Wheeler* at 323-24. Thus, despite Appellant's attempts to relitigate credibility determinations on appeal, the best place to litigate credibility determinations is not on appeal, where the Court has only a "cold record" before it. Instead, as noted in *Ex parte Lewis*, "[t]rial courts are in the best position to determine whether a prosecutor's conduct evinces an intent to cause a mistrial." *Ex parte Lewis* at 362.

Ultimately, the question to be answered is this: "What was the prosecutor's intent, and was that intent to provoke the defense into requesting a mistrial?" Based on the objective facts and circumstances in the record, the prosecutors' intent was not to elicit the challenged statements at issue or to "goad" the defense into requesting a mistrial.

In his analysis of the issue, Appellant focuses solely on the portions of the record where the three prohibited statements at issue were given in making his argument that the State intended to provoke the defense into moving for a mistrial.[51] But, the prosecutor's lack of intent to provoke a mistrial is shown as much from the portions of the record that do not deal with the statements at issue as from the portions that do deal with the challenged statements. For example, during the State's opening statement, only the following two statements were said about the complaints at issue: "You're going to hear that he received some

---

[51] (Appellant's Br. at 9-25).

49

complaints regarding the Defendant, Raul Constancio, or that he was made aware of some incidents involving the Defendant."; and "You're going to hear that once those incidents were received regarding the Defendant, that Officer Overholser approached the Defendant and asked him what was going on. He reported that information back to Mr. Blanda, and at that time Mr. Blanda made the decision to criminal-trespass Raul Constancio from the Courtyards of Monterey.[52] Likewise, during the witnesses testimony, with the exception of the three incidents discussed in this brief, there were no other instances where any specific extraneous bad act evidence on Appellant's part was discussed in the jury's presence. After the first two instances with Blanda, the only question asked of Blanda by the State on direct examination about any complaints against Appellant was the following: "Was the reason for this lease violation complaints that you had had about the Defendant?"[53] That question was asked to show why the lease violation was given against Ledesma, but the specific facts of any complaints against Appellant were not elicited. Likewise, during the redirect examination, only the following two questions were asked: "You made the decision based on complaints without getting into what those complaints were?" and "You made your decision based on complaints that the Defendant needed to be criminally trespassed from the

---

[52] (RR vol. 4, p. 23). No specifics were given during the opening statement about the complaints received by the apartment manager or about any statements from Appellant made to Overholser. (RR vol. 4, pp. 21-25).
[53] (RR vol. 4, p. 37).

property?"[54]  As with the earlier question asked during the direct examination, the facts of the complaints themselves were not elicited.  During Overholser's testimony, he was asked the following question: "And did you at any point in - - or did you at any point receive complaints by the manager of the apartment complex, Jim Blanda, about the Defendant?"[55]  No specifics about the "complaints" were given.[56]

As shown from the foregoing, the prosecutors did not intend to admit otherwise inadmissible evidence—and certainly not with the intent to provoke the defense into moving for a mistrial.  The prosecutors' actions regarding the first and second instances likely rises to the level of negligence for not properly admonishing Blanda and for not understanding the full scope of the motions in limine and the court's order, but at the very worse-case scenario only arises to recklessness.[57]  But, "when a prosecutor is merely reckless, one cannot say the prosecutor has made the decision to seek a mistrial.  Only when the prosecutor intends to provoke the defendant's mistrial motion can it be said that the

---

[54] (RR vol. 4, p. 61).

[55] (RR vol. 4, p. 68).

[56] *Id.*

[57] It is hard to see how the third instance can be attributed to the prosecutors in any way, shape, or form—especially since (as noted above) the prosecutor did admonish Overholser about the motion in limine prior to his testimony and he expressed understanding of the scope of what he could testify to during his testimony.  But, if the prohibited statement is somehow attributable to the State, it would only be under a negligence standard, which obviously does not arise to intent to provoke the defense into requesting a mistrial.

prosecutor, rather than the defendant, has exercised primary control over the decision to seek the trial termination." *Ex parte Lewis* at 358-59. Based on the record evidence, while negligence or reckless conduct *may* have been shown, intentional conduct has not. Instead, the prosecutors' actions were the result of mere negligence or inadvertence; none of the prosecutors' actions was done with the intent to provoke a mistrial.[58]

In *Ex parte Peterson* (a pre-*Lewis* case), the Court of Criminal Appeals noted that, when discussing the prosecutor's intent,

> [n]o one is immune to mistakes or lapses in judgment. Especially during the 'rough and tumble' of a jury trial, courts must expect that much rule-violating conduct is unplanned, inadvertent, or impulsive. But just as a dog knows the difference between being kicked and being stumbled over, judges can distinguish between intentional or reckless misconduct and inadvertent or negligent mistakes.

*Ex parte Peterson* at 817-18 (*internal footnote omitted*). The trial judge—who was actually present during trial and the hearings—heard the explanations given by the prosecutors and was obviously able to (and ultimately did) "distinguish between intentional . . . misconduct and inadvertent or negligent mistakes." *Id.* at 818.

---

[58] *See, e.g., Ex parte Washington* at 238-39 (finding that retrial was not jeopardy-barred after the State's witnesses violated the motion in limine on three separate occasions—with one of those occasions being intentional—since the prosecutor did not engage in the conduct with the intent to goad the defendant into requesting a mistrial); *Ex parte Chavez*, No. 02-13-00310-CR, 2014 WL 491813 at *3, 2014 Tex. App. LEXIS 1409 at *7-8 (Tex. App.—Fort Worth Feb. 6, 2014, no pet.) (*not designated for publication*) (finding that retrial was not jeopardy-barred after the witness alluded to extraneous bad acts on four occasions—one of which was done during defense counsel's questioning—since the prosecutor did not intentionally provoke the defense into moving for a mistrial).

That decision is entitled to deference since it was based on credibility determinations made after listening to the prosecutors' reasons regarding all three statements discussed in this brief.

Appellant, however, argues—based on a cold record—that the State intentionally provoked the defense to declare a mistrial because its enhancement notice was incorrect.[59] He argues that "[w]ith the mistrial declaration, the State had (and has taken) the opportunity to correct its mistakes, thereby securing confinement upon a finding of guilt, with the trial court having the option to suspend confinement."[60] In other words, he argues that the State provoked the defense into requesting a mistrial so it could guarantee confinement (since the "floor" for confinement would be raised to a minimum of 30 days confinement[61]— assuming that the sentence is not suspended).

The assertion that the prosecutors committed intentional misconduct so they could seek to enhance the *floor* of Appellant's sentence is so laughable as to not even be deserving of a response. However, to the extent that it is deserving of a response, that claim is fallacious. First off, what prosecutor in their right mind is going to risk their career—indeed, their law license—to secure an enhanced

---

[59] (Appellant's Br. at 3, 26-30).
[60] (Appellant's Br. at 26).
[61] TEX. PEN. CODE ANN. § 12.43(b)(2).

sentence of confinement?[62]  Second, there is absolutely no record evidence for

Appellant's theory that the State goaded the defense into a mistrial so it could seek

to enhance the range of punishment in a retrial—exactly because there is no

evidentiary support for any of Appellant's claims.[63]  Indeed, his entire

"evidentiary" support is his own argument that the State learned before—or right at

the start of—trial that it could not enhance the sentence; therefore, the State *must*

*have* sought to provoke the defense into declaring a mistrial so it could secure an

enhanced sentence.  Not only does that not qualify as evidentiary support, but that

is a blatant Post Hoc fallacy since there is no reason to suspect any causal

connection between the two events.[64]  Third, and finally, if the State were seeking

confinement that badly, the obvious route to take would have been to seek a

continuance before trial started so that the State could then file a proper notice of

enhancement—not to go into trial and hope to "engage in such misconduct" that

---

[62]  Indeed, if this did occur, then—as noted by the prosecutor during the writ hearing—a grievance with the State Bar would be appropriate "if you believe that any actions taken during the course of that trial rise to that level.  That's what it amounts to.  It amounts to that type of prosecutorial misconduct."  (RR vol. 6, p. 21).

[63]  Defense counsel's argument that "[t]he [S]tate benefitted in that they got a second bite at the apple" and served her "with an amended notice of enhancement" (RR vol. 6, p. 12) does not qualify as evidentiary support.  In fact, as noted by the prosecutor during the same hearing, the prosecutors were anticipating that there could be adverse rulings against them, which "happens in every trial."  (RR vol. 6, p. 16).  That does not mean that the State intentionally sought a defense-requested mistrial—either in this case or in every other trial before that court—due to adverse rulings.

[64] While it is true that the State filed its *First Amended Notice of Intent to Use a Prior Conviction to Enhance the Range of Punishment of the Charged Offense* on July 29, 2014, after the mistrial had been declared (CR pp. 88-89), that does not establish a causal connection between the filing of the amended notice and any intent by the prosecutors while the trial was ongoing.

the defense would then move for a mistrial. However, no motion for continuance was ever filed (as shown from the absence of such in the Clerk's Record)—exactly because obtaining an enhanced floor in the range of punishment was not quite the "big deal" for the State that Appellant intimates on appeal.

Appellant has failed to show—and cannot show, since the record does not reflect—that the prosecutors intentionally goaded Appellant into requesting a mistrial. The only instance where the prosecutor intentionally acted to introduce improper evidence (under the mistaken belief that it was proper), was when she introduced the statement in the lease violation. The first and third instances were incorrect, unwanted responses by State's witnesses to questions asked of them—with the third instance being an answer given to a question asked by the defense. None of these instances, however, show that the prosecutor acted with the intent to provoke the defense into moving for a trial—which is the standard required by *Oregon v. Kennedy* and *Ex parte Lewis* for retrial to be jeopardy-barred following a mistrial granted at the defendant's request. *See Kennedy* at 676, 676, 679, 102 S.Ct. at 2088-90; *Ex parte Lewis* at 336.

The trial court's ruling denying the application for writ of habeas corpus was not an abuse of discretion. Consequently, Appellant's sole issue should be overruled.

## Conclusion and Prayer

For the reasons stated above, the State respectfully requests that the Court affirm the trial court's ruling denying the pretrial application for writ of habeas corpus and remand the case to the trial court for a retrial in this case.

Respectfully submitted,

*MATTHEW D. POWELL*
Criminal District Attorney
State Bar No. 00784782


By: /s/ Jeffrey S. Ford
Jeffrey S. Ford
Assistant Criminal District Attorney
Lubbock County, Texas
State Bar No. 24047280
P.O. Box 10536
Lubbock, Texas 79408
(806)775-1166
FAX (806)775-7930
E-mail: JFord@co.lubbock.tx.us

## Certificate of Service

I certify that a true copy of the foregoing brief has been delivered to Allison Clayton, Attorney for Appellant, by e-mail delivery to Allison@AllisonClaytonLaw.com on January 30, 2015.

*MATTHEW D. POWELL*
Criminal District Attorney
State Bar No. 00784782


By: /s/ Jeffrey S. Ford
Jeffrey S. Ford

56

## Certificate of Compliance

Pursuant to TEX. R. APP. P. 9.4(i)(3), I further certify that, relying on the word count of the computer program used to prepare the foregoing State's Response, this document contains 12,327 words, inclusive of all portions required by TEX. R. APP. P. 9.4(i)(1) to be included in calculation of length of the document.

*MATTHEW D. POWELL*
Criminal District Attorney
State Bar No. 00784782


By: /s/ Jeffrey S. Ford
Jeffrey S. Ford